Filed 9/19/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAN FRANCISCO APARTMENT ASSOCIATION et al., <br><br>     Plaintiffs and Respondents, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, <br><br>     Defendant and Appellant. | A144702 <br><br> (City and County of San Francisco <br>   Super. Ct. No. CPF-14-513452) |

      This is an appeal from the trial court's grant of a writ of mandate and injunctive relief in favor of plaintiffs San Francisco Apartment Association (SFAA), Coalition for Better Housing (CBH), and San Francisco Association of Realtors (SFAR) (collectively, plaintiffs). Plaintiffs sought this relief against defendant City and County of San Francisco (City/County) on preemption grounds, asserting that a local ordinance, San Francisco Planning Code, article 3, section 317, subdivision (e)(4) (hereinafter, section 317(e)(4) or Ordinance), absolutely conflicted with the Ellis Act of 1985, Government Code section 7060 et seq. (hereinafter, Ellis Act).

      The Ellis Act is a California statute that, among other things, protects property owners' right to exit the residential rental business. The Ordinance, in turn, was enacted in its current form in December 2013 as part of Ordinance No. 287-13 in response to a growing concern by the Board of Supervisors (and others) about the shortage of affordable local housing and rental properties. Pursuant to section 317(e)(4), certain residential property owners – to wit, those undertaking no-fault evictions, including so-called Ellis Act evictions – became subject to a 10-year waiting period after withdrawing

a rental unit from the market before qualifying to apply for approval to merge the withdrawn unit into one or more other units.[1] Following several rounds of briefing and a contested hearing, the trial court agreed with plaintiffs that the Ordinance impermissibly penalized property owners for exercising their rights under the Ellis Act and, as such, was facially void on preemption grounds. Accordingly, the trial court entered an order enjoining the City/County from enforcing the Ordinance as to property owners undertaking no-fault evictions pursuant to the Ellis Act.

On appeal, the City/County challenges the trial court's reasoning and decision as legally flawed, as well as the trial court's threshold finding that plaintiffs had standing to bring this preemption action.

For reasons to follow, we reject the City/County's contention that plaintiffs lack standing to bring this preemption action. In addition, we conclude, like the trial court, that section 317(e)(4) is preempted by the Ellis Act to the extent it requires a landlord effectuating a no-fault eviction to wait 10 years before applying for a permit to undertake a residential merger on the property. Accordingly, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On January 28, 2014, plaintiffs filed a verified petition for writ of mandate and complaint for injunctive and declaratory relief (petition) alleging the City/County violated the Ellis Act by enacting section 317(e)(4) as part of the San Francisco Planning Code. This provision provides in relevant part: "The [City's] Planning Commission shall not approve an application for merger if any tenant has been evicted pursuant to [San Francisco] Administrative Code Sections 37.9(a)(9) through 37.9(a)(14) where the tenant was served with a notice of eviction after December 10, 2013 if the notice was

---

[1]    A "residential merger" is defined by the San Francisco Planning Code as "the combining of two or more legal Residential Units, resulting in a decrease in the number of Residential Units within a building, or the enlargement of one or more existing units while substantially reducing the size of others by more than 25% of their original floor area, even if the number of units is not reduced." (§ 317, subd. (b)(7).)

2

served within ten (10) years prior to filing the application for merger."[2]  (§ 317(e)(4).)

The Administrative Code provisions referred to in section 317(e)(4) – namely, sections 37.9(a)(9) through 37.9(a)(14) – set forth six permissible grounds for evicting a non-faulting tenant, including conversion of the rental unit into a condominium and temporary removal for the purpose of undertaking capital improvements or rehabilitative work on the unit.[3]  (See S.F. Admin. Code, § 37.9, subds. (a)(9)-(a)(14).)

The Ellis Act, in turn, absolutely prohibits local government entities from "compel[ling] the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease, except for guestrooms or efficiency units within a residential hotel . . . ."[4]  (Gov. Code, § 7060, subd. (a).)

---

[2]     As the City/County notes, other subdivisions of the Ordinance create certain exemptions from the requirement that property owners wait 10 years before merging two or more residential units, including exemptions for units that are "demonstrably not affordable or financially accessible housing," or units owned by various governmental entities.  (§ 317, subds. (e)(3), (g).)  In addition, section 317(e)(4) itself states:  "This Subsection (e)(4) shall not apply if the tenant was evicted under Section 37.9(a)(11) or 37.9(a)(14) and the applicant(s) either (A) have certified that the original tenant reoccupied the unit after the temporary eviction or (B) have submitted to the Planning Commission a declaration from the property owner or the tenant certifying that the property owner or the Rent Board notified the tenant of the tenant's right to reoccupy the unit after the temporary eviction and that the tenant chose not to reoccupy it." (§ 317(e)(4).)  However, plaintiffs have challenged only section 317(e)(4) as it applies to mergers following evictions noticed pursuant to Administrative Code section (e)(13), otherwise known as Ellis Act evictions.

[3]     Among other things, the San Francisco Administrative Code establishes mandatory procedures that landlords must follow when withdrawing rental units from the rental market, including service of a notice of termination of tenancy on all tenants in possession of the unit and a notice of intent to withdraw rental units with the San Francisco Rent Board prior to the withdrawal.  (S.F. Admin. Code, § 37.9(a)(13).)

[4]     The Ellis Act was originally enacted to counteract a California Supreme Court decision, *Nash v. City of Santa Monica* (1984) 37 Cal.3d 97, which upheld the constitutionality of a city ordinance requiring owners of residential rental property who wanted to remove their property from the rental market by demolition or conversion to obtain a permit prior to removing it.  As explained by our First District Appellate colleagues:  "The city would issue the mandatory permit only where (1) the property was unoccupied by or unaffordable to a low- or moderate-income person, (2) the property's removal from the rental market would not adversely affect the housing supply, and

According to plaintiffs' petition, section 317(e)(4) effectively undermines this provision of the Ellis Act by "penaliz[ing] property owners who exercise their rights under state law and thereby seek[ing] to compel continuing residential rentals, notwithstanding the Ellis Act."  Plaintiffs thus sought the writ of mandate to enjoin the City/County from "enforcing section (e)(4) insofar as it applies to owners who notice evictions pursuant to Administrative Code section 37.9(a)(13) [to wit, Ellis Act evictions]."

On February 27, 2014, the City/County answered the petition, denying that section 317(e)(4) "adversely affect[ed] the ability of [plaintiffs] to purchase, sell, manage or otherwise control real property or to exercise their constitutional and statutory rights with respect to real property they own or manage in San Francisco."  The City/County also set

_____

(3) the owner could not make a reasonable return on investment.  (*Nash, supra,* at pp. 100-101.)  *Nash* upheld the ordinance, holding that a residential rental property owner does not have a constitutional right, free from government interference, to go out of the rental business. (*Id*. at pp. 103-104.) [¶] The legislative response was passage of the Ellis Act, which prohibits a city or county from enacting legislation that compels the owner of residential real property to offer or continue to offer accommodations  in the property for rent or lease." (*Reidy v. City & County of San Francisco* (2004) 123 Cal.App.4th 580, 587-588.)

Thus, in enacting the Ellis Act and thereby overturning this case law, the Legislature expressly stated its intent in relevant part as follows:  "It is the intent of the Legislature in enacting this chapter to supersede any holding or portion of any holding in *Nash v. City of Santa Monica, supra,* 37 Cal.3d 97 to the extent that the holding, or portion of the holding, conflicts with this chapter, so as to permit landlords to go out of business. However, this act is not otherwise intended to do any of the following:
 "(a) Interfere with local governmental authority over land use, including regulation of the conversion of existing housing to condominiums or other subdivided interests or to other nonresidential use following its withdrawal from rent or lease under this chapter.
  "(b) Preempt local or municipal environmental or land use regulations, procedures, or controls that govern the demolition and redevelopment of residential property.
  "(c) Override procedural protections designed to prevent abuse of the right to evict tenants.
  "(d) Permit an owner to withdraw from rent or lease less than all of the accommodations, as defined by paragraph (1) or (2) of subdivision (b) of Section 7060. . . ."  (Gov. Code, § 7060.7, subds. (a)-(d).)

forth several affirmative defenses, including lack of standing, police power and separation of powers.

On December 18, 2014, the trial court granted the writ of mandate and declared section 317(e)(4) facially invalid and unenforceable insofar as it applies to landlords who notice evictions pursuant to the Ellis Act. The trial court reasoned the Ordinance improperly sought to restrain plaintiffs from permanently exiting the residential rental business by requiring a 10-year waiting period before approval could be obtained for merging two or more units of the property. The trial court thus permanently enjoined the City/County and its agents and representatives from enforcing section 317(e)(4) as to landlords who notice evictions pursuant to the Ellis Act. The trial court entered judgment in plaintiffs' favor on December 18, 2014. This appeal of the trial court's ruling followed.

## DISCUSSION

The City/County raises three primary contentions on appeal. First, the City/County contends that, as a threshold matter, plaintiffs have not established their associational standing to bring this action, requiring reversal on jurisdictional grounds without regard to the merits of their petition. Second, the City/County contends that, in any event, the Ordinance is a valid exercise of the police power preserved for local governments by the California Constitution. (Cal. Const., art. XI, § 7 ["A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws"].) As such, the City/County reasons, the Ordinance is not preempted by the Ellis Act, a state statute that expressly reserves for local governments the authority to enact such land use laws within their confines.[5] And

---

[5]     As will be discussed in more detail below, the Legislature amended the Ellis Act in 1999, confirming its intent to protect the right of landlords to go out of business, while adding new language to section 7060.7 to clarify that the Act is "not otherwise intended to . . . [¶] (a) Interfere with local governmental authority over land use, including regulation of the conversion of existing housing to condominiums or other subdivided interests or to other nonresidential use following its withdrawal from rent or lease under [the Act]. [¶] (b) Preempt local or municipal environmental or land use regulations,

5

finally, the City/County contends that, even assuming the Ordinance could, in certain situations, apply in a manner in conflict with the Ellis Act, plaintiffs herein have mounted a facial challenge to the Ordinance, requiring a showing that "no set of circumstances exist under which the [law] would be valid." (See *Association of California Ins. Cos. v. Poizner* (2009) 180 Cal.App.4th 1029, 1054). Here, the City/County insists, plaintiffs have failed to make this requisite showing of facial invalidity. We address these issues in turn below.

## I.    Do Plaintiffs Have Standing to Bring this Action?

As an initial matter, the City/County challenges plaintiffs' associational standing to bring this action for writ relief on behalf of their members. The applicable law is not in dispute.

"A litigant's standing to sue is a threshold issue to be resolved before the matter can be reached on its merits. [Citation.] Standing goes to the existence of a cause of action (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 862, p. 320), and the lack of standing may be raised *at any time* in the proceedings. [Citations.]" (*Apartment Association of Los Angeles County v. City of Los Angeles* (2006) 136 Cal.App.4th 119, 128 [*Apartment Association*].) " ' " 'An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " ' [Citation.] [Citation.]" (*Apartment Association, supra*, 136 Cal.App.4th at p. 129.)

Here, the City/County disputes the existence of just one of the three identified criteria: The standing of individual members to sue on their own behalf. According to the City/County, plaintiffs have failed to establish their individual members could have challenged the validity of the Ordinance in their own right because they have failed to prove their members are "beneficially interested" in the outcome of these proceedings.

procedures, or controls that govern the demolition and redevelopment of residential property." (§ 7060.7, subds. (a), (b).)

6

(See *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 165 ["As a general rule, a party must be 'beneficially interested' to seek a writ of mandate. (Code Civ. Proc., § 1086.)"]; see also *Friends of Oceano Dunes, Inc. v. San Luis Obispo Air Pollution Control Dist.* (2015) 235 Cal.App.4th 957, 962 [for standing purposes, the "beneficial interest must be direct and substantial"].)

Below, the trial court found plaintiffs had satisfactorily proved the beneficial interest of their members, reasoning that section 317(e)(4) "infringes on the[] [members'] right to own, manage and serve as agents for rental properties in San Francisco which are regulated by section 317(e)(4)." According to the trial court: "Section 317(e)(4) directly infringes on the constitutional right of SFAA and CBH members to exit the rental market under the Ellis Act. [Citation.] Similarly, section 317(e)(4) adversely affects the ability of real estate agents and brokers, represented by SFAR, to market, sell, and manage rental properties located in the City and County of San Francisco. [Citation.] Thus, the individual members of the three petitioner organizations will be injured by 317(e)(4) if it is enforced, and as such could have challenged the Ordinance in their own right."

We conclude the trial court's findings on the threshold issue of standing are adequately supported by evidence in the record in the form of sworn declarations submitted by three individuals on behalf of plaintiffs. For example, Janan New, Executive Director of SFAA, filed a declaration attesting that, among other things, the plaintiff organization had 2,800 active members that collectively own more than 65,000 residential units. As soon as the Ordinance passed, New received numerous calls from members protected under the Ellis Act asking how the new law would apply to residential properties in San Francisco and for the organization to file a lawsuit in order to protect their rights.

Brook Turner, Executive Director of CBH, filed a declaration, in turn, attesting that, collectively, CBH's members own more than 20,000 residential units in San Francisco, and that each member is protected by the Ellis Act and would be subject to the merger ban under section 317(e)(4) to their detriment.

7

And, finally, Walter Baczkowski, Chief Executive Officer of SFAR, filed a declaration attesting that its 4,200 agent/broker members are engaged for their livelihood in the sale or rental of residential real property in San Francisco and would be adversely affected by continued enforcement of section 317(e)(4). As one example of such adverse effects, Baczkowski pointed out that SFAR members are harmed when the Ordinance discourages prospective buyers from purchasing buildings in San Francisco where Ellis Act evictions have occurred in situations where the prospective buyers seek to merge units in the building to, e.g., form and occupy a single family residence.

This evidentiary showing is adequate to prove plaintiffs' associational standing. The fact that plaintiffs did not offer proof that each individual member had suffered, or was at imminent risk of suffering, actual injury is of no moment. The City/County directs us to no legal authority suggesting otherwise. Rather, the relevant authority makes clear it is enough if the plaintiff organization proves by a preponderance of the evidence that its members have " 'some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' [Citation.] . . . [To the contrary,] [w]rit relief is not available if the petitioner gains no direct benefit from the writ's issuance, or suffers no direct detriment from its denial. [Citation.]" (*League of California Cities v. Superior Court* (2015) 241 Cal.App.4th 976, 985. Accord *Apartment Association, supra,* 136 Cal.App.4th at pp. 127-129 [individual members of a trade organization representing owners and managers of residential rental property in the City had standing to challenge a municipal rent stabilization ordinance where said members were subject to the ordinance and, thus, were or could become subject to its restrictions on collecting excessive rent from qualified low income, disabled or senior tenants]; *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 363 ["if . . . [plaintiff organization] could demonstrate that the [project stabilization agreement] specification has the effect of infringing its members' rights of association or expression, or that it has an anticompetitive impact on them, then [it] might legitimately claim a beneficial interest within the meaning of Code of Civil Procedure section 1086"].) And, here, this standard

8

has been met given the evidence in plaintiffs' sworn declarations that thousands of their individual members are involved in the sale and rental of residential rental properties in San Francisco, are protected by the Ellis Act, and would or could be negatively impacted by the continued enforcement of the Ordinance's 10-year merger ban in buildings where Ellis Act evictions have occurred.

Accordingly, we affirm the trial court's threshold finding that plaintiffs have associational standing to bring this action and proceed to the merits.

## II.     Is Section 317(e)(4) a Valid Exercise of Local Government Authority or Fatally Inconsistent with State Law?

The City/County's central challenge is to the trial court's finding that the Ordinance is facially invalid and unenforceable insofar as it applies to landlords seeking approval to merge residential units after undertaking an Ellis Act eviction on their property. The parties agree the de novo standard of review governs. (*Johnson v. City and County of San Francisco* (2006) 137 Cal.App.4th 7, 12; *Fiscal v. City & County of San Francisco* (2008) 158 Cal.App.4th 895, 904 ["A trial court's decision invalidating a local ordinance on grounds of preemption is reviewed de novo"].) The well-established principles of preemption are as follows.

### A.     The Principles of Preemption.

" '[A] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.' (Cal. Const., art. XI, § 7.) 'Land use regulation in California historically has been a function of local government under the grant of police power contained in article XI, section 7 . . . . "We have recognized that a city's or county's power to control its own land use decisions derives from this inherent police power, not from the delegation of authority by the state." ' (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1151 [45 Cal.Rptr.3d 21, 136 P.3d 821], fn. omitted (*Big Creek Lumber Co.*).) Consistent with this principle, 'when local government regulates in an area over which it traditionally has exercised control, such as the location of particular land uses, California courts will presume, absent a clear indication of preemptive intent from the Legislature, that such

9

regulation is *not* preempted by state statute.' (*Id*., at p. 1149; see [citation.])" (*City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729, 742-743 (*City of Riverside*).)

However, a local ordinance may not conflict with state law; if it does, it is void. (*City of Riverside, supra,* 56 Cal.4th at p. 743; see also *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897 (*Sherwin-Williams*).) For purposes of the preemption analysis, local legislation conflicts with state law if it " 'duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.' " ' [Citations.]" (*Sherwin-Williams, supra*, at p. 897.) To "duplicate" state law, the local legislation must be "coextensive therewith." (*Ibid*.) To "contradict" state law, the local legislation must be "inimical thereto." (*Ibid*.) Moreover, the " 'contradictory and inimical' form of preemption does not apply unless the ordinance directly requires what the state statute forbids or prohibits what the state enactment demands." (*City of Riverside, supra,* 56 Cal.4th at p. 743.) In other words, if "it is reasonably possible to comply with both the state and local laws," there is no inimical conflict. (*Ibid*.)

To enter an area "fully occupied" by general law, in turn, the Legislature must either expressly or impliedly manifest the intent to so occupy the area. Express intent is where the Legislature has directly stated that the field has been occupied. Implied intent, on the other hand, is where " '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality. [Citations.]" (*Sherwin-Williams, supra*, 4 Cal.4th at pp. 897-898; *City of Riverside, supra*, 56 Cal.4th at p. 743; see also *California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 188.) In the words of the California Supreme Court: " 'We have been particularly

10

"reluctant to infer legislative intent to preempt a field covered by municipal regulation when there is a significant local interest to be served that may differ from one locality to another." ' [Citations.] ' "The common thread of the cases is that if there is a significant local interest to be served which may differ from one locality to another then the presumption favors the validity of the local ordinance against an attack of state preemption." ' [Citations.]" (*City of Riverside, supra,* 56 Cal.4th at p. 744.)

Finally, in performing the preemption analysis, we must keep in mind the general rule that the validity of a legislative enactment hinges on the enactment's actual operation and effect rather than the subjective motivation of the legislators: " '[The] rule is general with reference to the enactments of all legislative bodies that the courts cannot inquire into the motives of the legislators in passing them, *except as they may be disclosed on the face of the acts*, or inferrible from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments." (*County of Los Angeles v. Superior Court* (1975) 13 Cal.3d 721, 726 citing *Soon Hing v. Crowley* (1885) 113 Cal. 703, 710-711, italics added.) Thus, "[p]urpose alone is not a basis for concluding a local measure is preempted. While [reviewing courts] have occasionally treated an ordinance's purpose as relevant to state preemption analysis [citations], we have done so in the context of a nuanced inquiry into the ultimate question in determining field preemption: whether the effect of the local ordinance is in fact to regulate in the very field the state has reserved to itself." (*California Grocers Assn. v. City of Los Angeles, supra,* 52 Cal.4th at p. 190, fn. omitted.)

Returning to this case, the trial court found section 317(e)(4) preempted by the Ellis Act because the Ordinance "penalizes landlords for leaving the rental business by banning any mergers in a building for ten years after a landlord removes the property from the rental market under the Ellis Act. Such punishments are preempted, regardless of whether they take the form of formal permits, additional notification requirements, waiver of future rights, or burdens on a landlord's exercise of his or her rights, because

11

they directly contradict state law by penalizing and discouraging conduct that the Ellis Act expressly authorizes."[6]  In so finding, the trial court noted that, according to statistics from the San Francisco Rent Board, of the four types of no-fault evictions subject to the 10-year merger ban under section 317(e)(4), Ellis Act evictions are "by far the most common ground [for eviction], and so is the *de facto* prime target of [the Ordinance]." Accordingly, the trial court declared the Ordinance facially void.  Having applied the legal principles set forth above, we agree with the trial court's conclusion.  To explain why, we first look more closely at these two laws.

**B.      The Interplay Between the Ellis Act and Section 317(e)(4).**

As stated above, the Ellis Act provides real property owners the absolute right to exit the residential rental business.  " 'The legislative history of the Act consistently demonstrates the purpose of the Act is to allow landlords who comply with its terms to go out of the residential rental business by evicting their tenants and withdrawing all units from the market, even if the landlords could make a fair return, the property is habitable, and the landlords lack approval for future use of the land.  In addition to the statement of legislative intent contained in the Act (Gov. Code, § 7060.7), the various legislative committee reports concerning the Act indicate the Act was intended to overrule the *Nash* decision so as to permit landlords the unfettered right to remove all residential rental units from the market, consistent of course, with guidelines as set forth in the Act and adopted by local governments in accordance thereto.  (See Sen. Com. on Judiciary (1985-1986), Reg. Sess., Analysis of Sen. Bill No. 505, Local Controls Residential Real Property, p. 2 ["The purpose of this bill is to overturn *Nash* and to provide landlords the unfettered right to remove rental units from the marketplace"]; [citations] . . . .)'  Thus, the Ellis Act was clearly meant to preempt any local ordinance that prohibited a landlord from removing its rental units from the marketplace.  (Gov. Code, § 7060.7; *Javidzad v. City of Santa*

---

[6]      In finding the Ordinance preempted by the Ellis Act, the trial court expressly relied on the following cases, which will be discussed in depth below:  *Reidy v. City & County of San Francisco* (2004) 123 Cal.App.4th 580, 588; *Javidzad v. City of Santa Monica, supra,* 204 Cal.App.3d at p. 530; and *L.A. Lincoln Place Investors, Ltd. v. City of Los Angeles* (1997) 54 Cal.App.4th 53, 61-62.

*Monica* (1988) 204 Cal.App.3d 524, 530 . . . [(*Javidzad)*]; *City of Santa Monica v. Yarmark* [(1988)] 203 Cal.App.3d [153,] 165 . . . ; accord, *Channing Properties v. City of Berkeley* (1992) 11 Cal.App.4th 88, 94 . . . ." (*L.A. Lincoln Place Investors, Ltd. v. City of Los Angeles* (1997) 54 Cal.App.4th 53, 61-62 (*Lincoln Place I*).)

At the same time, however, courts both recognize and respect the reservations of power set forth in the Ellis Act with respect to local government authorities: "Notwithstanding Section 7060, nothing in this chapter does any of the following: [¶] . . . [¶] (b) Diminishes or enhances . . . any power which currently exists or which may hereafter exist in any public entity to grant or deny any entitlement to the use of real property, including, but not limited to, planning, zoning, and subdivision map approvals." (§ 7060.1, subd. (b).) Meanwhile, elsewhere in the Ellis Act, the legislature expressly denies any intent to, among other things, "[i]nterfere with local governmental authority over land use," "[p]reempt local . . . land use regulations, procedures, or controls that govern the demolition and redevelopment of residential property," or "[o]verride procedural protections designed to prevent abuse of the right to evict tenants." (Gov. Code, § 7060.7, subds. (a)-(c).) Considered in its entirety, "the Ellis Act does not prohibit local governments from providing procedural protections designed to prevent abuse of the right to evict tenants (§ 7060.7, subd. (c)), [but] it 'completely occupies the field of substantive eviction controls over landlords who wish to withdraw' all units from the residential rental market. [Citation.]" (*Johnson, supra,* 137 Cal.App.4th at p. 14.)

Not surprisingly, in our case, the parties disagree on whether section 317(e)(4) has the effect of regulating in the very field the state has expressly reserved to itself vis-à-vis the Ellis Act, or of regulating in one of the fields reserved under the Act for local government entities. For its part, the City/County denies the Ordinance violates any conduct or activity prohibited under the Ellis Act, and insists the preemption doctrine is simply not applicable. In support of its contention, the City/County argues, first, that the Ordinance does not "target" properties subject to Ellis Act evictions because it imposes the same 10-year waiting period on applications to merge housing units that have been the subject of several types of "no-fault" evictions, not just Ellis Act evictions.

13

Additionally, the City/County denies the Ordinance in any way penalizes property owners for exercising their rights under the Ellis Act because it "does not condition the right to leave the rental market on fulfillment of any prerequisites, payment of any fee, or satisfaction of any pre-condition that could result in a defense to an unlawful detainer action."

Turning to the City/County's first point, we disagree with its premise that the preemption analysis turns on whether a local ordinance "targets properties" subject to the Ellis Act. Rather, as the case law from above makes clear, our analysis focuses more broadly on whether the local ordinance " 'duplicates, contradicts, or enters an area fully occupied by general law . . . .' " (*Sherwin-Williams, supra*, 4 Cal.4th at p. 897.) Further, as our First District colleagues have held, the state, by means of the Ellis Act, "completely occupies the field of substantive eviction controls over landlords" desiring to exit the residential rental market. (*Johnson, supra*, 137 Cal.App.4th at p. 14.) As such, the key issue here is not whether the Ordinance imposes a 10-year waiting period only on Ellis Act evictions, or on a variety of no-fault evictions. Rather, the issue is whether the Ordinance enters into the field of "substantive eviction controls over landlords" that has been reserved for the State.[7] (See *ibid.*) And, for reasons explained below, when the Ordinance is considered in this light, it becomes clear the City/County's second point – to

---

[7] Below, the trial court took judicial notice of the San Francisco Rent Board's published statistics on eviction notices from 2013 through 2015. Based upon these statistics, the trial court found that, as a practical matter, Ellis Act evictions are the primary type of no-fault eviction affected by the Ordinance. Specifically, pointing out that several types of evictions fall outside the Ordinance's 10-year ban (including owner move-ins, capital improvements and lead abatement), the trial court explained that, "[u]ltimately, only four no-fault eviction types face an absolute 10-year ban: (1) condominium conversion, (2) demolition of unit, (3) substantial rehabilitation, and (4) Ellis Act. However, of these four types of no-fault evictions subject to the 10-year ban, Ellis Act evictions are "by far the most common [one], and so is the *de facto* prime target of [the Ordinance]." The City/County has not challenged this finding by the trial court. And while it is certainly not a dispositive factor, it is nonetheless relevant under our preemption analysis to whether the City/County invaded a field fully occupied by state law.

wit, that the Ordinance does not amount to a substantive limit on the right of a landlord to withdraw units from the rental market – lacks merit.

Specifically, we conclude the Ordinance does in fact penalize property owners who leave the residential rental market, at least those property owners leaving the market for the purpose of merging a withdrawn rental unit with one or more of the owners' other units. In fact, the Ordinance also penalizes owners seeking to merge multiple units of their property for the purpose of selling the property as a single family residence, and not just to exercise their personal right to exit the residential rental market. In both situations, the Ordinance imposes a mandatory 10-year waiting period on the property owners, running from the date on which notice of eviction is served upon the tenant of the unit to be withdrawn from the rental market, before the owners may apply to the planning commission for the appropriate permit to merge the units. In doing so, the Ordinance imposes a mandatory restriction on the rights of property owners that far exceeds the scope of permissible local governance delineated by the Ellis Act.

The City/County nonetheless maintains that the Ordinance merely, and permissibly, regulates the particulars of a landlord's proposed merger of residential units. We disagree. Indeed, our appellate colleagues in this District have aptly explained the difference between permissible local "regulation" of residential rental property and impermissible infringement upon a landlord's exercise of Ellis Act rights: "Following the 1985 enactment of the Ellis Act, appellate courts uniformly concluded that the act bars local ordinances that condition a residential landlord's right to go out of business on compliance with requirements that are not found in the Ellis Act. The courts also uniformly concluded that a city retains its traditional police power to regulate the subsequent use of the property after the property's removal from the rental market. Thus, for example, if an ordinance requires a residential landlord to obtain a removal permit before removing a rent-controlled rental unit from the rental housing market by demolition or conversion, and further requires that the landlord must satisfy specified criteria before the removal permit will issue, the ordinance infringes on the landlord's decision to go out of the rental housing business and conflicts with the Ellis Act.

15

However, the city retains the authority to regulate the particulars of the demolition and the redevelopment of the property after it is withdrawn from the rental market." (*Reidy v. City & County of San Francisco* (2004) 123 Cal.App.4th 580, 588 (*Reidy*).)

We agree with this analysis. Further, we conclude, contrary to the City/County's contention, that a 10-year prohibition on removing a rental unit from the market for the purpose of merger is more akin to a substantive requirement triggered upon a landlord's notice of intent to remove a rental unit from the rental housing market than to local regulation of "the particulars of the demolition and the redevelopment of the property after it is withdrawn . . . ." (*Reidy, supra,* 123 Cal.App.4th at p. 588.) Specifically, rather than regulating the particulars of a landlord's proposed merger (or demolition or conversion) of a residential unit, section 317(e)(4) *prohibits* a landlord withdrawing a residential unit from the rental market from merging the unit with another unit for 10 years. In doing so, section 317(e)(4) imposes a penalty on the very class entitled to protection under the Ellis Act – to wit, landowners seeking to exit the residential rental business. As such, under the legal authority cited above, section 317(e)(4) is indeed invalid. (Accord *Lincoln Place I, supra,* 54 Cal.App.4th at pp. 63, 65 [rejecting argument that "its ordinance is not preempted because it does not provide a substantive barrier to a landlord's right to go out of the rental business but only imposes a procedural requirement that must be met before the application to demolish is granted"]; *Javidzad, supra,* 204 Cal.App.3d 524.) Moreover, contrary to the City/County's related argument, the fact that this 10-year ban on applying for merger approval begins to run when the landlord exits the residential rental business rather than before the landlord exits the business does not make this ban any less of a penalty triggered by the landlord's exercise of Ellis Act rights.

The City/County attempts to distinguish this case from those striking down local ordinances as fatally inconsistent with the Ellis Act, including *Lincoln Place I, Reidy* and *Javidzad*. The City/County reasons that, unlike in those other cases, here, a landlord remains free to exit the rental market and to use his or her property in any number of authorized ways, subject only to the Ordinance's 10-year waiting period if the landlord

16

intends to merge the withdrawn unit with another. However, examination of these cases reveals the flaw in the City/County's analysis.

In *Javidzad*, for example, the invalidated local ordinance prohibited a landowner from demolishing a rental unit unless the landowner first qualified for and obtained a removal permit. To qualify and obtain this permit, the landowner had to do one of three things: (1) demonstrate the landowner could not make a fair return on the rental unit(s); (2) demonstrate the property was uninhabitable; or (3) promise to develop new units subject to rent control. Finding this ordinance invalid on preemption grounds, our appellate colleagues reasoned that it impermissibly conditioned the landowner's right to exit the residential rental business on compliance with requirements not found in the Ellis Act. In so finding, the court rejected the defendant's argument, similar to the City/County's argument herein, that the local ordinance was merely a land use regulation that, consistent with the Ellis Act, authorized permanent demolition, conversion, or alteration of the withdrawn units: "[Appellants] submit that in passing the Act, the Legislature intended nothing more than to enable a landlord to go out of business by evicting all the tenants residing in a building, and a property owner who has done so has obtained the full benefit of the Act. Appellants do recognize the denial of a removal permit precludes the redevelopment of a property. They insist, however, a landlord who is thereby left with a vacant apartment building is merely paying the price of choosing to go out of business! [¶] Appellants' strained reading of the Act would result in an absurdity. Denying . . . a removal permit to a landlord who has gone out of the rental housing business imposes a prohibitive price on the exercise of the right under the Act." (*Javidzad, supra,* 204 Cal.App.3d at pp. 530-531.)

Similarly, in *Reidy, supra*, 123 Cal.App.4th 580, a preemption challenge was made under the Ellis Act to a local ordinance making it unlawful to change the use of, eliminate, or demolish a residential hotel unit without first obtaining a permit to convert. However, before this permit would issue, the hotel owner was required to provide one-for-one replacement of the units to be converted by constructing or bringing onto the market new residential units meeting certain requirements or, alternatively, by paying an

in-lieu fee. Again, the appellate court declined to accept the defendant/local government's argument that this permit to convert was merely a land use regulation that did not implicate or infringe upon a landlord's right to exit the residential rental business: "Because section 41.20, subdivision (a)(1) of the HCO makes it unlawful for a residential hotel owner to change the use of, or eliminate a residential hotel unit without first obtaining a permit to convert, and sections 41.13 and 41.14 do not allow the issuance of a conversion permit until the owner provides replacement housing, these sections effectively conditioned the right of a City and County of San Francisco hotel owner to go out of the rental business before January 1, 2004, on compliance with requirements that were not found in the pre-2004 Ellis Act." (*Reidy, supra*, 123 Cal.App.4th at p. 593.) As such, the plaintiffs' challenge succeeded. (*Ibid.*)

Lastly, in *Lincoln Place I*, a city ordinance prohibited the plaintiff landowners from demolishing their rental units unless they first obtained a removal permit, which, in turn, required as a precondition their agreement to sign a covenant restricting use of the property for either themselves or for "any purchaser, encumbrancer, assignee, devisee and transferee" for a period of 10 years after the date of demolition. (*Lincoln Place I, supra,* 54 Cal.App.4th at p. 64.)[8] According to our Second District, Division Five colleagues, this local ordinance was void as applied to the plaintiff landowners because it imposed a "prohibitive price" on their right to exit the rental business by preconditioning issuance of the necessary demolition permit on meeting requirements not found in the Ellis Act. (*Id.* at pp. 64-65 [declining to "construe th[e] ordinance as simply a means by which the city is exercising its power to determine whether a future use of the property will conflict with its general plan because the ordinance also impermissibly prevents the plaintiffs from exercising their right to simply go out of the rental business"].)

The principle readily distilled from these cases is that a public entity may not impose an inevitable and undue burden (to wit, a "prohibitive price") on a landlord's

---

[8]     There was an exemption under the ordinance for those landowners intending to use the property to develop low income housing. (*Lincoln Place I, supra,* 54 Cal.App.4th at p. 64.)

18

exercise of its right under the Ellis Act to exit the residential rental business. (E.g., *Lincoln Place I, supra*, 54 Cal.App.4th at p. 65; see also *Pieri v. City & County of San Francisco* (2006) 137 Cal.App.4th 886, 893 (*Pieri*); *Johnson, supra*, 137 Cal.App.4th at p. 14 ["Placing requirements on landlords that are inconsistent with their right to go out of business under the Ellis Act 'imposes a prohibitive price on the exercise of the right under the Act' "].) Further, applying this principle here, we find no valid basis to distinguish section 317(e)(4) from the invalidated local ordinances discussed above. Reasonably construed, section 317(e)(4), like the other invalidated measures, prevents landowners from exercising their right to simply go out of business. (*Javidzad, supra*, 204 Cal.App.3d at pp. 530-531; see also *Reidy, supra*, 123 Cal.App.4th at pp. 590-591.) While the City/County may be correct that local governments retain the right under the Act to "to regulate the subsequent use of the property following its removal from the rental market," here, the City/County has, in effect, barred landowners from using their property if their proposed use involves merging a withdrawn unit with another. The fact that the City/County may have been motivated in part by the worthy goal of preserving the stock of affordable housing is of no moment. Under the legal authority cited above, such exercise of local power is invalid, as it constitutes local intrusion into the wholly state-occupied field of substantive eviction controls over landlords wishing to withdraw units from the residential rental market.[9] (See *Reidy, supra*, 123 Cal.App.4th at p. 592

---

[9]     If there could be any doubt section 317(e)(4) was intended — at least on some level — to punish or, at minimum, discourage landlords from conducting Ellis Act and other no-fault evictions, it is dispelled by the Ordinance's legislative history. Prior to its enactment, the Ordinance's sponsor, Supervisor John Avalos, stated that his intent was to "propose an additional amendment to prevent owners from evicting tenants to either alter a nonconforming unit or to convert, merge, or demolish a unit," albeit in furtherance of the commendable goal of protecting tenants and preserving the City's stock of affordable housing. And while the motive or purpose of individual legislators does not determine the validity of an ordinance (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1093), in this case, the legislative body (Board of Supervisors) incorporated into section 1, subdivision (c) of Ordinance No. 287-13 the express findings that "the Department is supportive of efforts to discourage displacing tenants through no-fault evictions" and that "the proposed additional modifications *would create a disincentive to evict by linking no-*

19

["Legislature did not intend the 2000 amendments [to the Ellis Act] to permit cities to promulgate land use regulations applicable to property subsequent to an Ellis Act filing, if those regulations effectively compel residential rental use and prevent the property owner from quitting the rental business"]; *First Presbyterian Church v. City of Berkeley* (1997) 59 Cal.App.4th 1241, 1249 ["[t]he trial court correctly ruled: (1) the Ellis Act 'provides landlords with the right to go out of the rental business'; (2) the Ellis Act preempts the NPO and the LPO 'in so far as they interfere with and restrain the ability of landlords seeking to remove . . . rental units from the rental market'; and (3) the NPO is therefore 'invalid and of no force and effect to the extent that issuance of a demolition permit [under the NPO] would require findings as to future construction of units or habitability of the structure to be demolished' "] (*First Presbyterian Church*). Cf. *Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 451 *[Lincoln Place II]* [mitigation conditions approved by the City's planning commission did not impermissibly burden landowner's right to go out of the rental business because: (1) the landowner agreed to the conditions; (2) the landowner could exit the rental business upon completion of the conditions; and (3) the conditions "are not particularly onerous, and do not preclude [the landowner] from ultimately going out of the rental business at the site"]; *Pieri, supra*, 137 Cal.App.4th at p. 892 ["We cannot conclude . . . the imposition of relocation assistance payments must inevitably place an undue burden

---

*fault evictions to a prohibition to merge, convert, or to demolish a unit*." (See also Planning Commission Resolution No. 19009 (italics added).) As such, the legislative purpose to, essentially, interfere with those exercising their State-guaranteed Ellis Act rights has been made part of the San Francisco Planning Code itself. And, as mentioned above, legislative intent is relevant in the preemption context when determining whether a local ordinance "enters a field 'fully occupied' by [state] law" (see *Sherwin-Williams, supra*, 4 Cal.4th at p. 898), because such intent may be reflective of the intended scope of local control. (See *Johnson, supra,* 137 Cal.App.4th at p. 14 [noting the Ellis Act "completely occupies the field of substantive eviction controls over landlords who wish to withdraw [units] from the residential rental market," but leaves to local public entities the right to, among other things, regulate land use].) As such, we conclude the undeniable fact that the Board sought to discourage or penalize Ellis Act evictions when enacting section 317(e)(4) is relevant to (and weighs in favor of) our preemption analysis, even if it is not dispositive.

on a landlord's right to withdraw from the rental business" given that, "[i]n stating that it neither diminishes nor enhances the power of public entities to mitigate adverse impacts on displaced tenants, [§ 7060.1(c)] clearly contemplates that public entities have some such power under existing law"].)  Thus, because the Ordinance constructs an inevitable substantive barrier to the statutorily-protected right of a landlord to leave the residential rental business, we stand by the trial court's decision to invalidate it.[10]

In attempting to avoid this conclusion, the City/County raises the additional argument that *Reidy*, *Javidzad* and *First Presbyterian Church* are no longer good law in light of the Legislature's 1999 amendment to the Ellis Act.  In doing so, the City/County directs us to a select part of the legislative history of the 1999 amendment to the Ellis Act, quoted in *Lincoln Place II*: " 'Since the Ellis Act was adopted in 1986, a string of court decisions has undermined the compromise reached in Ellis between the rights of a property owner to remove rental units from the market and the ability of a local government to mitigate the effects of tenant displacement and to regulate the subsequent use of the property.' (Sen. Housing & Community Development Com., Analysis of Sen. Bill No. 948 (1999–2000 Reg. Sess.) Apr. 5, 1999, Comments, para. 4.) The amendments to the Ellis Act 'make[] it clear that local governments have authority to regulate the demolition of rental property and the authority to regulate the conversion of non-residential use following its withdrawal from rent or lease.' (Sen. Housing & Community Development Com., 3d reading analysis of Sen. Bill No. 948 (1999–2000 Reg. Sess.) as amended Aug. 16, 1999, Comments, para. 3.)" (*Lincoln Place II, supra,* 155 Cal.App.4th

---

[10]    As the City/County points out, the San Francisco Planning Code provides for a review process whenever a landowner applies for a permit to demolish, merge or convert a residential unit, which, among other things, requires the planning commission to consider the effect of the proposed demolition, merger or conversion on the number of affordable rental units in the surrounding area.  There is no challenge under the Ellis Act to this discretionary process.  In any event, it appears consistent with the inherent police power of local governments to regulate land use, a power expressly recognized by the Act, in that planning commission review of permit applications does not, in and of itself, extract a penalty from landlords seeking to exit the residential rental market.  However, for the reasons stated above, the Ordinance at issue goes far beyond mandating a discretionary review.

21

at p. 443.)  We conclude nothing in the above-quoted passage establishes legislative intent to overrule long standing case law.  When our Legislature intends to overrule case law, it makes such an intent clear, as it did when enacting the Ellis Act in the first place. (See, e.g., Gov. Code, § 7060.7 ["It is the intent of the Legislature in enacting this chapter to supersede any holding or portion of any holding in *Nash v. City of Santa Monica*, 37 Cal.3d 97 to the extent that the holding, or portion of the holding, conflicts with this chapter, so as to permit landlords to go out of business"].)  Here, the Legislature does not even mention the aforementioned cases, much less express the intent to overrule them. Rather, the Legislature expressly states that its intent in passing the 1999 amendment was to clarify the Ellis Act does not "[p]reempt local or municipal environmental or land use regulations, procedures, or controls that govern the demolition and redevelopment of residential property" (Gov. Code, § 7060.7, subd. (b)), diminish or enhance "any power which currently exists or which may hereafter exist in any public entity to grant or deny any entitlement to the use of real property, including, but not limited to, planning, zoning, and subdivision map approvals."  (Gov. Code, § 7060.1, subd. (b).)  Under these circumstances, we decline the City/County's invitation to in any way alter or add to the Legislature's express intent with respect to the 1999 amendment.[11]  (*People v. Davenport* (1985) 41 Cal.3d 247, 266 ["it should not be presumed that the legislative body intends to overthrow long-established principles of law unless such intention is made clearly to appear either by express declaration or by necessary implication"]; cf. *Pieri, supra*, 137 Cal.App.4th at pp. 891-892 [rejecting plaintiffs' statutory interpretation argument where the Legislature, by recent amendment, eliminated the very statutory language relied upon by plaintiffs and the case law they cite (without expressly overruling this case law)].)

Finally, following oral argument in this matter, the parties were asked to submit supplemental letter briefs to address the issue of whether, if an owner uses the Ellis Act to remove a two-unit residential property from the rental market and thereafter obtains a

---

[11]     To the extent *Lincoln Place II* suggests otherwise, we respectfully disagree with our colleagues' decision in this limited regard.  (See *Lincoln Place II, supra,* 155 Cal.App.4th at p. 443.)

22

permit to merge the two units, the displaced tenants would have a right to reoccupy the newly merged property. (See Gov. Code, § 7060.2, subd. (c) ["A public entity . . . may require . . . that an owner who offers accommodations again for rent or lease within a period not exceeding 10 years from the date on which they are withdrawn, and which are subject to this subdivision, shall first offer the unit to the tenant or lessee displaced from *that unit* by the withdrawal. . . ."] [italics added].)  This request stemmed from the City/County's contention at oral argument that the Ordinance was designed to prevent landlords from evading certain requirements under the Ellis Act with respect to tenants displaced by the landlord's removal of rent-controlled property from the residential rental market, including offering the tenants the opportunity to re-occupy the property.  In its supplemental brief, the City/County again defends the Ordinance by arguing that, by "requiring owners who evict tenants under the Ellis Act to wait to merge until the tenants' re-occupancy rights have expired, Section 317(e)(4) ensures that if the owner elects to reenter the residential rental market within 10 years, the evicted tenant will at least have the opportunity to re-occupy his former residence."

We reject this argument.  The City/County acknowledges that, when two units are merged, the two original units no longer exist, but have effectively been demolished.  As such, the right to re-occupancy under section 7060.2, subdivision (c) — which applies only when a particular unit removed from the market is returned to the market within 10 years — is simply not triggered.  At the same time, another Ellis Act provision, section 7060.2, subdivision (d), is in fact triggered.  This provision provides in relevant part that, if "the accommodations are demolished, and new accommodations are constructed on the same property, and offered for rent or lease *within five years* of the date [of their withdrawal], the newly constructed accommodations shall be subject to any system of controls on the price at which they would be offered on the basis of a fair and reasonable return on the newly constructed accommodations . . . ."  (§ 7060.2, subd. (d), italics added.)  As such, we reject the City/County's suggestion that the Ordinance serves a legitimate local purpose wholly consistent with the Ellis Act.  While the City/County may be entitled to enact an ordinance imposing restrictions on the rent that may be charged for

23

merged or reconstructed units within five years of removal of the former units from the rental market, the Ordinance before us exceeds any such restriction. To wit, the Ordinance also prohibits an owner from removing a property from the rental market and for 10 years merging the unit with another unit for the purpose of residing in or selling the merged units – inconsistent, as we have explained, with the Ellis Act. For this reason, we stand by our conclusion that the Ordinance is fatally inconsistent with the Ellis Act.

### III.    Did Plaintiffs Successfully Prove the Ordinance Facially Void?

Next, the City/County challenges the trial court's finding that section 317(e)(4) is facially void under the Ellis Act with respect to the 10-year prohibition of mergers following notice of intent to undertake an Ellis Act eviction. According to the City/County, plaintiffs failed their burden as the party making a facial challenge (as opposed to an "as applied" challenge) to establish "the challenged [law] 'inevitably pose[s] a present total and fatal conflict' with applicable prohibitions." (*Assn. of California Ins. Cos. v. Poizner, supra,* 180 Cal.App.4th at p. 1054; see also *Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660, 678; accord *United States v. Salerno* (1987) 481 U.S. 739, 745.) The City/County reasons that the Ordinance applies to all landlords seeking to merge residential units after undertaking a no-fault eviction, not just those seeking to merge units after an Ellis Act eviction, such that a challenge limited to landlords effectuating Ellis Act evictions cannot invalidate the Ordinance in its entirety. Additionally, the City/County faults plaintiffs for failing to establish all landlords effectuating Ellis Act evictions would, if permitted, seek approval to merge units within 10 years of serving notice of eviction.[12] Under these circumstances, the City/County insists, there is one or more conceivable set of circumstances under which the Ordinance and the Ellis Act could operate consistently, rendering a facial challenge inappropriate.

---

[12]    As the City/County notes, the Ordinance creates several exemptions from the mandatory 10-year waiting period, including for landlords who temporarily evict tenants for the purpose of lead abatement or other capital improvement projects, or who are seeking to comply with a court-ordered eviction. (E.g., § 317, subd. (e)(3)); § 37.9, subd. (a)(11), (14).)

24

We reject these arguments. "In considering a facial challenge, we consider 'only the text of the measure itself, not its application to the particular circumstances of an individual.' (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) Thus, [as the City/County correctly notes], we invalidate the challenged ordinance only if it presents a ' " 'total and fatal conflict' " ' with state law." (*Pieri, supra*, 137 Cal.App.4th at p. 894.) To make this determination, however, we must focus on the interplay between the relevant state and local law, rather than the local law viewed in isolation. (See *Planned Parenthood v. Casey* (1992) 505 U.S. 833, 894 ["legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant"].) Having done so in this case, it is clear that, in every case where a San Francisco property owner exercises his or her right under the Ellis Act to withdraw a rental unit from the residential rental market in order to merge the unit with another, the property owner is met head-on with a locally-imposed legal barrier — to wit, the 10-year prohibition on applying to the planning commission for merger approval.

Viewed in this light, we agree with the trial court that the legality of section 317(e)(4) does not hinge on the circumstances of any particular individual; rather, its legality hinges on "only the text of the measure itself." (See *Tobe v. City of Santa Ana, supra,* 9 Cal.4th at p. 1084.) As such, we conclude plaintiffs' facial challenge to the Ordinance was appropriate. (See also *Travis v. County of Santa Cruz* (2004) 33 Cal.4th 757, 767 [a facial challenge to an ordinance is one "predicated on a theory that the mere enactment of the . . . ordinance worked a [constitutional violation]"].)

## DISPOSITION

The judgment is affirmed. Plaintiffs are awarded costs on appeal.

_____
Jenkins, J.

25

We concur:


_____
Pollak, Acting P. J.


_____
Siggins, J.


*San Francisco Apartment Association et al. v. City And County Of San Francisco*, A144702

Trial Court: Superior Court, City and County of San Francisco

Trial Judge: Hon. A. James Robertson II, Judge

Counsel for Appellant:
   City And County Of San Francisco

Dennis J. Herrera, City Attorney
Kristen A. Jensen, Deputy City Attorney
Brian F. Crossman, Deputy City Attorney

Counsel for Respondent:
  San Francisco Apartment Association et al.

NIELSEN MERKSAMER PARRINELLO GROSS & LEONI
    James R. Parrinello
    Christopher E. Skinnell
    James W. Carson

*San Francisco Apartment Association et al. v. City And County Of San Francisco*, A144702