Miller, J.
*79 The City and County of San Francisco adopted an ordinance that allows property owners to make changes to certain types of housing units that previously could not be enlarged, altered or reconstructed. But the ordinance imposes waiting periods of up to 10 years before changes can be made to units where tenants are evicted under "no-fault" provisions, including tenants who are evicted in accordance with the Ellis Act, which allows property owners who seek to exit the rental business to evict residential tenants and prohibits local governments from "compel[ling] the owner of any residential real property to offer, or to continue to offer accommodations in the property for rent or lease." ( Gov. Code, § 7060, subd. (a).) The Small Property Owners of San Francisco Institute (SPOSFI) filed a petition for writ of mandate and declaratory relief against the City and County, the Board of Supervisors (Board), the Planning *80 Commission (Commission), and the Planning Department (Department), collectively "the City," challenging *227 the ordinance on the grounds that the City failed to comply with the City Planning Code and with CEQA, and on the grounds that the ordinance imposes a prohibitive price on property owners exercising their right to exit the rental business and therefore conflicts with and is preempted by the Ellis Act. The trial court denied the petition, and judgment was entered in favor of the City.
SPOSFI argues on appeal that the trial court erred in denying a motion to augment the record, in determining that SPOSFI failed to timely raise challenges to the ordinance under the San Francisco Planning Code and CEQA and therefore waived them, and in determining that the ordinance does not conflict with the Ellis Act. In the unpublished portion of this opinion we conclude that SPOSFI has not shown error with respect to the record or waiver. In the published portion, we conclude that the ordinance is preempted by the Ellis Act because it requires a property owner who exercises Ellis Act rights to wait 10 years before being eligible for a permit to make alterations. Therefore, we shall reverse the judgment.
FACTUAL AND PROCEDURAL BACKGROUND
Before San Francisco Ordinance No. 286-13 (Ordinance No. 286-13) was adopted in December 2013, section 181 of San Francisco's Planning Code generally prohibited the enlargement, alteration or reconstruction of "nonconforming units," which are legal residential housing units that exceed the currently-permitted density for the zoning district in which they are located.[1] As modified by Ordinance No. 286-13, Planning Code section 181, subdivision (c), now permits the enlargement, alteration or reconstruction of nonconforming residential units in zoning districts where residential use is principally permitted, as long as the changes do not extend beyond the "building envelope" as it existed on January 1, 2013. However, a waiting period of five to 10 years applies for changes to units where a tenant has been evicted under the provisions of San Francisco Administrative Code (Administrative Code) section 37.9, subdivisions (a)(8) through (a)(14), which set forth grounds for evicting a non-faulting tenant. (S.F. Planning Code (Planning Code), § 181, subd. (c)(3).) In particular, a 10-year waiting period applies if a tenant has been evicted under Administrative Code section 37.9, subdivision (a)(13), which allows a property owner to evict tenants to remove *81 residential units from the rental market in accordance with the Ellis Act.[2] ( Gov. Code, § 7060, subd. (a) [barring statutes and regulations that compel the owner of any residential real property to offer, or continue to offer, accommodations in the property for rent].)
A. Initial Proposal to Allow Changes to Nonconforming Units
In January 2013, Supervisor John Avalos introduced a proposed ordinance that would modify the Planning Code in several different respects, including by allowing *228 the enlargement or alteration of nonconforming units in zoning districts where residential use is principally permitted. The Board transmitted the proposed ordinance to the Department for environmental review under CEQA.[3] The Department determined that the ordinance was "[n]ot a project" under CEQA Guidelines section 15060, subdivision (c)(2) (Cal. Code Regs., tit. 14, § 15060, subd. (c)(2) ), and noted that individual projects proposed under the ordinance would undergo physical environmental review.
The Commission held a hearing on the proposed ordinance in July 2013. In advance of the hearing, Department staff prepared an executive summary, which raised the possibility that allowing changes to nonconforming units might have unintended consequences. Staff explained that "very often nonconforming units are among the city's most affordable housing stock, and are often subject to rent control." Allowing changes to those units "would provide increased flexibility, which could encourage the improvement, expansion, or production of family-sized housing," but that "[a]lternatively, the amendments could result in expansions that would increase the cost of the units, including rental units, such that they are no longer affordable." The Department could not predict the effects of changing the law, "but encourage[d] decision-makers to carefully consider these potential impacts to the city's most affordable, yet unsubsidized, form of housing."
At the Commission meeting, a memorandum from Supervisor Avalos was circulated proposing amendments to the ordinance, including two that related to nonconforming units. To preserve the affordability of nonconforming units, Supervisor Avalos proposed prohibiting alterations that would extend beyond the building envelope as it existed on January 1, 2013. To prevent owners from evicting tenants for the purpose of altering units, he proposed prohibiting alterations if a building had a "no-fault" eviction, including an Ellis Act eviction under section 37.9, subdivision (a)(13) of the Administrative Code, *82 within the past 10 years.[4] During the July 2013 hearing, a member of Supervisor Avalos's staff discussed amending the ordinance to address concerns that allowing changes to nonconforming units could give property owners the incentive to evict tenants so the owners could alter the units.
At the close of the hearing, the Commission adopted a recommendation that the portion of the proposed ordinance concerned with allowing enlargements and alterations of nonconforming units be split from the remainder of the proposal, and continued to September 2013.[5]
*229 B. Adoption of Ordinance No. 286-13
About 10 days after the July 2013 hearing, Supervisor Avalos introduced a new proposed ordinance that would permit enlargement, alteration, or reconstruction of a nonconforming unit if the building is located in a zoning district where residential use is principally permitted so long as the enlargement, alteration, or reconstruction did not extend beyond the building envelope as it existed on January 1, 2013. The Board transmitted the proposed ordinance to the Department for environmental review, and the Department determined that the ordinance was not a project for purposes of CEQA.
The Commission held a hearing on the new proposed ordinance in September 2013. In advance of the hearing, Department staff prepared an executive summary stating that the limitation of changes to the existing building envelope reduced the likelihood that expanding nonconforming units would make them less affordable. At the hearing, Supervisor Avalos's aide, Jeremy Pollock, informed the Commission that Supervisor Avalos's office and the city attorney were "working on language that would not allow for alterations in units that had had an eviction, a no fault eviction within the last 10 years." Pollock explained, "[W]e're basically looking to model that [language] on other places in the Planning Code that have restrictions on *83 no-fault eviction, such as the recently passed condo conversion ordinance and also the garage ordinance that dealt with garages in Chinatown, Telegraph Hill and North Beach." The Commission asked for public comment; none was offered.
During discussion of the proposed ordinance by the Commission, Department staff member Sophie Hayward noted that Supervisor Avalos "has been very clear to date as to the changes that he is hoping to make to this ordinance, which relates to language regarding no-fault eviction. If any other substantive change were made it would be automatically referred back to the Planning Commission." Commissioner Antonini, the only member of the Commission to vote against the ordinance, cited the proposed amendment regarding no-fault evictions as a reason for his opposition: "It reminds me of the garage door. We went through a discussion on a property ... and the present owners had nothing to do with the evictions that happened many years before, ... and they just wanted to provide garages for their own use. And [a supervisor] introduced this legislation to link them to something that happened well before and they had no control over. [¶] Ten years is a long time and you could have ownership changes. So just on the basis of that being part of this legislation, I think parts of this have some good uses, but I think that in particular I don't like." The Commission voted to approve the proposed ordinance by a vote of 6 to 1.
The Board's Land Use and Economic Development Committee (Land Use Committee or Committee) considered the ordinance and solicited public comment at a meeting in November 2013. At the meeting, Supervisor Avalos's aide Pollock asked the Committee to adopt the amendment that alterations not be allowed for 10 years where no-fault evictions had occurred, and to continue the item for two weeks, anticipating that the language of the amendment would be available before the next hearing. Pollock explained that the purpose of the amendment was to avoid creating an incentive for owners to evict tenants, renovate the units, and then rent or sell them at a higher rate. The Committee asked for public comment; none was forthcoming; and the Committee then voted to accept the amendment and continue the *230 item as amended until the next Committee meeting.
The proposed ordinance was discussed again at a December 9, 2013 meeting of the Committee. As reflected in the meeting notice, the ordinance to be discussed did not permit owners to make changes if tenants had been evicted under certain Rent Ordinance provisions. Supervisor Avalos spoke about the ordinance at some length, and explained that the ordinance included "safeguards to ensure that allowing alterations to [nonconforming] units won't have unintended consequences that reduce their affordability or encourage displacement of tenants." During the public comment period, two representatives of SPOSFI spoke. President Nuney Rickan expressed concerns that *84 the ordinance would reduce the number of affordable rentals. Peter Rice expressed concerns that the ordinance would make it more difficult for middle-income people to find housing to purchase, and said he would "leave to the lawyers to interpret whether or not you can tinker with the Ellis Act the way that you're doing." Neither Rickan nor Rice raised any issues concerning CEQA or the requirements of the San Francisco Charter or Planning Code. At the end of the hearing, the Committee voted to refer the ordinance to the Board as a Committee report for the Board's meeting the next day, December 10.
At the December 10 Board meeting, the proposed ordinance passed unanimously on the first reading. On December 16, the Board received a letter from SPOSFI, dated December 13, 2013, objecting to the ordinance. For the first time, SPOSFI claimed that in passing the ordinance the Board would violate CEQA and the San Francisco Charter. SPOSFI also contended the ordinance was facially defective and preempted under the Ellis Act.
The Board passed the ordinance unanimously on second reading on December 17, 2013. On December 26, Mayor Lee signed the ordinance, numbered 286-13.
C. Trial Court Proceedings
SPOSFI filed a petition for writ of mandate and complaint for declaratory relief. The trial court heard argument, and subsequently denied the petition in its entirety. Judgment was entered for the City, and this appeal followed.[6]
DISCUSSION
A. Standard of Review
"In reviewing a judgment on a petition for writ of mandate, '[w]e review the trial court's findings of fact for substantial evidence and review its legal conclusions, including its interpretation of statutory provisions, under a de novo standard of review. [Citations.]' " ( Ashlan Park Center LLC v. Crow (2015) 233 Cal.App.4th 1274, 1278, 183 Cal.Rptr.3d 172, quoting First American Commercial Real Estate Services, Inc. v. County of San Diego (2011) 196 Cal.App.4th 218, 225, 126 Cal.Rptr.3d 630.) Whether state law preempts a local ordinance is a question of law subject to de novo review. ( Johnson v. City and County of San Francisco (2006) 137 Cal.App.4th 7, 12, 40 Cal.Rptr.3d 8 ( Johnson ).)
*85 B.-D.**
E. Ellis Act Challenge
SPOSFI argues that on its face the ordinance is preempted by the Ellis Act, on *231 the grounds that that by imposing a 10-year waiting period on altering nonconforming units where a tenant was evicted by a landlord exercising Ellis Act rights, the ordinance penalizes the exercise of those rights. We agree.
1. Applicable Law
The Ellis Act prohibits local governments from "compel[ing] the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease...." ( Gov. Code, § 7060, subd. (a).[10] ) "The Legislature enacted the Ellis Act following the California Supreme Court's opinion in Nash v. City of Santa Monica (1984) 37 Cal.3d 97, 207 Cal.Rptr. 285, 688 P.2d 894, upholding a city ordinance that required owners of residential real property to obtain a permit before they could remove property from the rental market. (§ 7060.7.) '[T]he Act was intended to overrule the Nash decision so as to permit landlords the unfettered right to remove all residential rental units from the market, consistent, of course, with guidelines as set forth in the Act and adopted by local governments in accordance thereto.' ( City of Santa Monica v. Yarmark (1988) 203 Cal.App.3d 153, 249 Cal.Rptr. 732 ( Yarmark ); § 7060.) The Act does not diminish or enhance a local government's ability 'to mitigate any adverse impact on persons displaced by reason of the withdrawal from rent or lease of any accommodations.' (§ 7060.1, subd. (c).) It likewise does not interfere with a local government's ability to regulate land use or override 'procedural protections designed to prevent abuse of the right to evict tenants.' (§ 7060.7, subd. (c).)" ( Johnson , supra , 137 Cal.App.4th at p. 12, 40 Cal.Rptr.3d 8.) However, "it 'completely occupies the field of substantive eviction controls over landlords who wish to withdraw' all units from the residential rental market." ( Id. at p. 14, 40 Cal.Rptr.3d 8, quoting Yarmark , supra , 203 Cal.App.3d at p. 167, 249 Cal.Rptr. 732.)
Local legislation that conflicts with state law is preempted by state law and is void. ( Johnson , supra , 137 Cal.App.4th at p. 13, 40 Cal.Rptr.3d 8.) " 'A conflict exists when the local legislation contradicts state law. Local legislation *86 contradicts state law when it is inimical to it.' " ( Id. , quoting Reidy v. City and County of San Francisco (2004) 123 Cal.App.4th 580, 587, 19 Cal.Rptr.3d 894 ( Reidy ).) In the context of a preemption analysis, an explicit contradiction between an ordinance and a state statute occurs "where the language of the ordinance directly contradicts the operative language of the statute, e.g., by penalizing conduct which the state law expressly authorizes...." ( Bravo Vending v. City of Rancho Mirage (1993) 16 Cal.App.4th 383, 396-397, 20 Cal.Rptr.2d 164.)
2. Analysis
SPOSFI argues that the ordinance is preempted on its face because, by imposing a 10-year waiting period on the modification of a non-conforming unit where a tenant was evicted under the Ellis Act, it penalizes a property owner's exercise of Ellis Act rights. The City raises three arguments in response: First, SPOSFI cannot state a facial challenge to the ordinance; second, the imposition of the 10-year waiting period falls within the City's authority to regulate land use and mitigate impacts on displaced tenants; third, the ordinance does not conflict with the Ellis Act because it does not impose a prohibitive price on exiting the rental business.
We conclude that SPOSFI has the better argument. Our analysis draws heavily *232 on the analysis by our colleagues in Division Three in SFAA , supra , 3 Cal.App.5th 463, 207 Cal.Rptr.3d 684, which affirmed a trial court ruling that the Ellis Act preempts a Planning Code provision that imposes a 10-year waiting period on merging units in properties where tenants have been evicted under no-fault provisions, including under the Ellis Act. ( SFAA , supra , 3 Cal.App.5th at p. 487, 207 Cal.Rptr.3d 684 ). The analysis of the preemption issue required the Court of Appeal to focus broadly on whether the Planning Code provision " ' "duplicates, contradicts, or enters an area fully occupied by general law...." ' " ( Id. at p. 479, 207 Cal.Rptr.3d 684, quoting Sherwin-Williams Co. v. City of Los Angeles (1993) 4 Cal.4th 893, 897, 16 Cal.Rptr.2d 215, 844 P.2d 534.) Since the Ellis Act " 'completely occupies the field of substantive eviction controls over landlords' desiring to exit the residential market' " ( ibid. , quoting Johnson , supra , 137 Cal.App.4th at p. 14, 40 Cal.Rptr.3d 8 ), and the ordinance amounted to a substantive limit on that right, the ordinance was preempted. In SFAA the ordinance penalized property owners who left the residential market, including at least owners leaving the market for the purpose of merging a withdrawn unit with another unit, by imposing a mandatory 10-year waiting period on the property owners before they could successfully apply for the necessary permit to merge the units. ( Ibid. ) This, the Court of Appeal concluded, was "a mandatory restriction on the rights of property owners that far exceeds the scope of permissible local governance delineated by the Ellis Act." ( Ibid. ) *87 The Court of Appeal in SFAA further concluded that the ordinance at issue there was facially void, rejecting the City's argument that a facial challenge was inappropriate because there were conceivable circumstances under which the challenged ordinance and the Ellis Act could operate consistently, and that therefore the plaintiffs had not established that the ordinance " 'inevitably pose[s] a present total and fatal conflict' " with the Ellis Act. ( SFAA , supra , 3 Cal.App.5th at p. 486-487, 207 Cal.Rptr.3d 684, quoting Association of California Ins. Companies v. Poizner (2009) 180 Cal.App.4th 1029, 1054, 103 Cal.Rptr.3d 458.) The SFAA court explained that in determining whether a challenged ordinance presents a total and fatal conflict with state law, and therefore is facially void, the court considers only the text of the ordinance, not its application to particular circumstances, and focuses on the interplay of the state and local laws. ( SFAA at p. 487, 207 Cal.Rptr.3d 684.) Doing so in SFAA , the court wrote, "it is clear that in every case where a San Francisco property owner exercises his or her right under the Ellis Act in order to withdraw a [nonconforming] rental unit from the residential market in order to merge the unit with another, the property owner is met head-on with a locally-imposed legal barrier-to wit, the 10-year" waiting period. ( Ibid. ) In that light, the legality of the challenged ordinance "hinge[d] on 'only the text of the measure itself.' " ( Ibid. , citing Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1084, 40 Cal.Rptr.2d 402, 892 P.2d 1145.) Accordingly, the facial challenge was appropriate. ( Ibid. )
The Court of Appeal in SFAA recognized that under the Ellis Act the City " 'retains its traditional police power to regulate the subsequent use of the property after the property's removal from the rental housing market,' " including " 'the particulars of the demolition and the redevelopment of the property after it is withdrawn from the rental market.' " ( SFAA , supra, 3 Cal.App.5th at p. 480, 207 Cal.Rptr.3d 684, quoting Reidy , supra , 123 Cal.App.4th at p. 588, 19 Cal.Rptr.3d 894.) The 10-year waiting period, however, was *233 "more akin to a substantive requirement triggered upon a landlord's notice of intent to remove a rental unit from the rental housing market than to local regulation of 'the particulars of the demolition and the redevelopment of the property after it is withdrawn....' " ( Ibid. , quoting Reidy , supra , 123 Cal.App.4th at p. 588, 19 Cal.Rptr.3d 894.) The ordinance in SFAA "rather than regulating the particulars of a landlord's proposed merger ... of a residential unit, ... prohibits a landlord withdrawing a residential unit from the rental market from merging the unit with another unit for 10 years. In doing so, [the *88 ordinance] imposes a penalty on the very class entitled to protection under the Ellis Act-to wit, landowners seeking to exit the residential rental business. As such, [the ordinance] is indeed invalid." ( SFAA at p. 480, 207 Cal.Rptr.3d 684.)
It is a straightforward matter to apply SFAA to the facts here. By imposing a 10-year waiting period on alterations to non-conforming units where property owners have exercised their Ellis Act rights, the ordinance penalizes property owners who leave the rental market. The ordinance does not regulate the particulars of the remodeling of a nonconforming unit, but rather prohibits any such changes for a period of 10 years after the property owner exits the rental business. By imposing such a prohibition on property owners who have left the rental market, the ordinance challenged here improperly enters the field of substantive eviction controls over such property owners. (See SFAA , supra , 3 Cal.App.5th at p. 479, 207 Cal.Rptr.3d 684.)
Contrary to the City's argument, SPOSFI has appropriately stated a facial challenge to the ordinance. Under the ordinance here, in every case where a property owner exercises the Ellis Act right to withdraw a nonconforming rental unit from the residential market, the property owner is met with a locally-imposed legal barrier: a 10-year waiting period before the unit can be remodeled. In this respect, the ordinance impedes property owners from exercising their Ellis Act rights to withdraw residential units from the rental market. It does not matter that the waiting period occurs after the Ellis Act eviction, rather than before it. (See SFAA , supra , 3 Cal.App.5th at p. 487, 207 Cal.Rptr.3d 684.)
Nor are we persuaded that the 10-year waiting period is nothing more than a provision that governs "the demolition and redevelopment of residential property." (§ 7060.7, subd. (b).) As in SFAA , the 10-year waiting period here is "more akin to a substantive requirement triggered upon a landlord's notice of intent to remove a rental unit from the rental housing market than to local regulation of 'the particulars of the demolition and the redevelopment of the property after it is withdrawn.' " ( SFAA , supra , 3 Cal.App.5th at p. 480, 207 Cal.Rptr.3d 684, quoting Reidy , supra , 123 Cal.App.4th at p. 588, 19 Cal.Rptr.3d 894.) Rather than regulating the particulars of a property owner's proposed alteration of a nonconforming unit, the ordinance here prohibits a property owner who has withdrawn a nonconforming unit from the market from altering it for 10 years, and in doing so penalizes property owners who are protected by the Ellis Act.
*89 Nor does the waiting period "mitigate any adverse impact on persons displaced by reason of the withdrawal from rent or lease of any accommodations." (§ 7060.1, subd. (c).) The City argues that if property owners were permitted to withdraw nonconforming rental units from the market and remodel them, the right of displaced tenants to reoccupy the vacated units would be vitiated, because if the units were rerented, they would "likely lose the affordability that is the hallmark of these *234 nonconforming units." The City claims that the ordinance prevents that from happening by "prohibiting substantial alterations only for the period prescribed in the Ellis Act." This argument is speculative and ignores the substantial protections provided by the Ellis Act and the Administrative Code to tenants who are evicted under the Ellis Act.[11] (§ 7060.2; Admin. Code, § 37.9A.) Furthermore, it is far from clear how a displaced tenant is helped by a unit remaining unimproved and off the rental market.
The City argues that even if the ordinance penalizes the exercise of Ellis Act rights it does not impose a "prohibitive price" on exiting the rental business. In the context of Ellis Act jurisprudence, a "prohibitive price" on a property owner's exercise of Ellis Act rights is an "inevitable and undue burden," ( SFAA , supra , 3 Cal.App.5th at p. 482, 207 Cal.Rptr.3d 684, citing cases including Johnson , supra , 137 Cal.App.4th at p. 14, 40 Cal.Rptr.3d 8 ["Placing requirements on landlords that are inconsistent with their right to go out of business under the Ellis Act 'imposes a prohibitive price on the exercise of the right under the Act' "].) Such burdens include significant restrictions on the landlord's use of the property when those restrictions are tied to the exercise of Ellis Act rights. In Pieri v. City and County of San Francisco (2006) 137 Cal.App.4th 886, 40 Cal.Rptr.3d 629, our colleagues in Division Four discussed the development of this aspect of law: "The court in Javidzad v. City of Santa Monica (1988) 204 Cal.App.3d 524, 526, 251 Cal.Rptr. 350, considered a city law that denied a removal permit to landlords who could make a fair return on their property unless the units were uninhabitable or unless the landlord intended to develop new rent controlled units. Noting that the denial of a removal permit precluded the redevelopment of the property, the court concluded the measure imposed a prohibitive price *90 on the exercise of the rights under the Ellis Act. ( Id. at p. 531, 251 Cal.Rptr. 350.) Other cases have concluded local measures violated the Ellis Act where they denied a permit for demolition of a residential building unless it would not be detrimental to housing needs and it would either remove a hazardous structure or would be necessary to permit construction of the same number of housing units ( First Presbyterian Church v. City of Berkeley (1997) 59 Cal.App.4th 1241, 1252-1253, 69 Cal.Rptr.2d 710 ); denied the right to demolish buildings unless the owners agreed to restrict the use of the land for themselves and their successors for 10 years ( Los Angeles Lincoln Place Investors, Ltd. v. City of Los Angeles (1997) 54 Cal.App.4th 53, 64, 62 Cal.Rptr.2d 600,); and denied the right to eliminate or demolish residential hotel units unless the owner either provided replacement units or paid the city 80 percent of the cost of replacement housing ( *235 Reidy , supra , 123 Cal.App.4th at pp. 589, 593, 19 Cal.Rptr.3d 894 ). Thus, in each of these cases, the local law on its face imposed a significant restriction on the landlord's use of the property." ( Pieri , supra , 137 Cal.App.4th at pp. 893-894, 40 Cal.Rptr.3d 629.)
Here, an inevitable burden of exercising Ellis Act rights is a prohibition against altering a non-conforming unit for 10 years. The City argues that the burden is reasonable because it "merely" requires property owners to observe the 10-year reoccupancy period recognized in the Ellis Act. (See § 7060.2, subd. (c) [authorizing public entities to require property owners who offer a unit for rent within 10 years of its removal from the rental market to offer the unit to the displaced tenant].) But the ordinance does more than that. It does not simply require that a unit that is returned to the market be offered to the displaced tenant: it imposes a waiting period on the alteration of nonconforming units where an Ellis Act eviction has taken place, no matter the use to which the unit is put. Like the 10-year waiting period on mergers analyzed in SFAA , the ordinance here "imposes a mandatory restriction on the rights of property owners that far exceeds the scope of permissible local governance delineated by the Ellis Act." ( SFAA , supra , 3 Cal.App.5th at p. 479, 207 Cal.Rptr.3d 684.)
We conclude that because it imposes a 10-year waiting period for alterations of properties that have been withdrawn from rental use under the Ellis Act, Planning Code section 181, subdivision (c)(3) conflicts with, and is preempted by, the Ellis Act.
*91 DISPOSITION
The judgment is reversed and the matter is remanded with directions to the trial court to enter an order enjoining the City from enforcing Planning Code section 181, subdivision (c)(3) as to property owners undertaking no-fault evictions under the Ellis Act. Appellant shall recover its costs on appeal.
We concur:
Kline, P.J.
Richman, J.

Nonconforming units were legally constructed before current zoning districts were established, and therefore generally exist in older buildings. If a building contains more units than currently permitted by the zoning district, the units must be designated as "conforming" or "nonconforming." Building owners choose which units to designate as conforming or nonconforming.

The Administrative Code establishes procedures for landlords to follow in withdrawing units from the rental market, requires relocation payments to tenants, and imposes restrictions on the return of withdrawn units to the rental market. (Admin. Code, § 37.9A.)

The California Environmental Quality Act, Public Resources Code section 21000 et seq.

The memorandum stated, "I would like to propose an additional amendment to prevent owners from evicting tenants to ... alter a nonconforming unit.... To accomplish this ... [¶] Section 181 would be amended so that nonconforming units could not be altered 'if the building has had one or more 'no-fault' evictions, as defined in 37.9(a)(7)-(13) of the Administrative Code, with each eviction associated with a separate unit(s) within the past ten years."

The remainder of the original proposal subsequently became Ordinance No. 287-13, which, among other things, amended Planning Code section 317, subdivision (e)(4) to impose five- to 10-year waiting periods on mergers of residential units if a tenant was evicted under Administrative Code sections 37.9, subdivision (a)(8) through 37.9, subdivision (a)(14). Our colleagues in Division Three affirmed a trial court ruling that the amended Planning Code section was preempted by the Ellis Act in San Francisco Apartment Association v. City and County of San Francisco (2016) 3 Cal.App.5th 463, 207 Cal.Rptr.3d 684 (SFAA ), which we discuss below.

We granted appellant's unopposed request that we take judicial notice of a senate committee's bill analysis of Senate Bill No. 948 (1999-2000 Reg. Sess.), which discusses amendments made to the Ellis Act.

See footnote *, ante .

Subsequent undesignated statutory references are to the Government Code.

These rights and remedies include the following: Ellis Act evictions require at least 120 days' notice; seniors and disabled individuals who have lived in their units for one year or more require at least one year's notice. (Admin. Code, § 37.9A, subd. (f)(4).) A tenant evicted under the Ellis Act is entitled to relocation money, half of which must be paid at the time the eviction notice is served. (Id. , § 37.9A, subd. (e)(3).) If a unit removed from the rental market under the Ellis Act is returned to the rental market within two years, the displaced tenant may sue for actual and exemplary damages. (Id. , § 37.9A, subd. (d)(1).) In addition, the City can bring a civil proceeding against the owner for exemplary damages for displacement of tenants. (Id. , § 37.9A, subd. (d)(2).) If the unit is returned to the rental market within five years, it must be re-rented at the old rate. (Id. , § 37.9A, subd. (b).) If the unit is returned to the rental market within 10 years, the evicted tenant has a right of first refusal. (Id. , § 37.9A, subd. (c).)