Filed 6/28/19; Certified for Partial Publication 7/22/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HOLLYWOODIANS ENCOURAGING RENTAL OPPORTUNITIES (HERO) et al., | B285553 |
| Plaintiffs and Appellants, v. | (Los Angeles County Super. Ct. No. BS163828) |
| CITY OF LOS ANGELES et al., Defendants and Respondents; | |
| MILLENNIUM SETTLEMENT CONSULTING / 1850 NORTH CHEROKEE, LLC et al., | |
| Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John A. Torribio, Judge.  Affirmed.

Angel Law, Frank P. Angel and Ellis Raskin for Plaintiffs and Appellants.

Advocates for the Environment, Dean Wallraff and Kathleen R. Unger for Affordable Housing Preservation Advocates, as Amicus Curiae on behalf of Plaintiffs and Appellants.

Eviction Defense Network, Elena I. Popp and Sean Chandra for Los Angeles Tenants Union, Public Counsel, National Lawyers Guild, Western Center on Law and Poverty, Strategic Actions for a Just Economy, and Anti-Eviction Mapping Project, as Amici Curiae on behalf of Plaintiffs and Appellants.

Remy Moose Manley, Sabrina V. Teller and Christina L. Berglund; Michael N. Feuer, City Attorney, and Oscar Medellin, Deputy City Attorney, for Defendants and Respondents.

Jeffer Mangels Butler & Mitchell, and Matthew D. Hinks, for Real Parties in Interest and Respondents.

————————

Plaintiffs and appellants Hollywoodians Encouraging Rental Opportunities (HERO), Sylvie Shain (Shain), and Max Blonde (Blonde) (sometimes collectively referred to as HERO) appeal a judgment denying their petition for writ of mandate. HERO's petition sought to set aside actions taken by defendants and respondents City of Los Angeles, City Council of the City of Los Angeles (City Council), and Central Los Angeles Area Planning Commission (Commission) (collectively, the City) in approving a proposal by real parties in interest and respondents Millennium Settlement Consulting/1850 North Cherokee, LLC, Lesser Investment Company, L.P., and David Lesser (collectively, the owner) to convert a vacant 18-unit apartment building into a boutique hotel.

2

In this case involving the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] the essential issue presented is whether the City erred in failing to prepare an environmental impact report (EIR) to assess the loss of affordable housing and displacement of tenants that would result from the conversion of the former apartment building into a hotel.

Because the building at issue had been withdrawn from the rental market years before the City commenced environmental review for the hotel project, we conclude there were no housing-related impacts or displacement of tenants for the City to address in an EIR. We also reject HERO's other contentions and affirm the judgment denying the petition for writ of mandate.

**OVERVIEW OF CEQA**

" 'In CEQA, the Legislature sought to protect the environment by the establishment of administrative procedures drafted to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions." ' [Citation.] At the 'heart of CEQA' (CEQA Guidelines, § 15003, subd. (a))[2] is the requirement that public agencies prepare an EIR for any 'project' that 'may have a significant effect on the environment.' [Citations.] The purpose of the EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate

---

[1]   All unspecified statutory references are to the Public Resources Code.

[2]   The CEQA Guidelines are found at California Code of Regulations, title 14, section 15000 et seq.

3

alternatives to such a project.' [Citation.] The EIR thus works to 'inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made,' thereby protecting ' "not only the environment but also informed self-government." ' [Citations.]" (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944—945 (*San Mateo*).)

Under "CEQA and its implementing guidelines, an agency generally conducts an initial study to determine 'if the project may have a significant effect on the environment.'[3] [Citation.] If there is substantial evidence that the project may have a significant effect on the environment, then the agency must prepare and certify an EIR before approving the project. [Citations.] On the other hand, no EIR is required if the initial study reveals that 'there is no substantial evidence that the project or any of its aspects may cause a significant effect on the environment.' [Citation.] The agency instead prepares a negative declaration 'briefly describing the reasons that a proposed project . . . will not have a significant effect on the environment and therefore does not require the preparation of an EIR.' [Citations.] Even when an initial study shows a project may have significant environmental effects, an EIR is not always required. The public agency may instead prepare a mitigated negative declaration (MND) if '(1) revisions in the project

---

**3** As relevant here, the environmental factors to be considered in an initial study include a project's potential impact on population and housing, and specifically, whether the project would "[d]isplace substantial numbers of existing people or housing." (Cal. Code Regs., tit. 14, § 15000 et seq., appen. G, § XIV.)

4

plans . . . before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment.' [Citation.]" (*San Mateo*, *supra*, 1 Cal.5th at p. 945.)

Here, the City's decision to adopt an MND rather than to prepare an EIR is the focus of this controversy.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *Events leading up to the City's approval of the conversion of the subject property to use as a 24-room boutique hotel.*

The subject real property, located at 1850 North Cherokee Avenue in the Hollywood area of Los Angeles, is a now-vacant 18-unit apartment building built in 1939, which was subject to the City's Rent Stabilization Ordinance (RSO) (Los Angeles Mun. Code (LAMC) § 151.00 et seq.). In 2009, the owner filed a land use application with the City to demolish the building and replace it with a 39-unit residential condominium project. In July 2009, the City Council adopted an MND pursuant to CEQA, finding that the condominium project would not have a significant effect on the environment.

In May 2013, the owner filed a notice of intent to withdraw all 18 units from rental housing use pursuant to the Ellis Act. (Gov. Code, § 7060 et seq.)[4] By October 2013, all the rental units

---

[4]     The Ellis Act "prohibits local governments from 'compel[ling] the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease . . . .' (Gov. Code, § 7060, subd. (a).)" (*Small Property*

5

had been vacated.  The City then approved the building for demolition.  In early 2014, however, the developer backed out due to a lack of financing, putting an end to the condominium project.

In July 2015, the owner submitted to the City an application for the hotel project at issue in this appeal (the Project), seeking to convert the property into a boutique hotel with 24 guest rooms.  The owner requested the following approvals:  a conditional use permit (CUP) to allow the operation of the hotel in an R4 zone; a zone variance to provide off-site parking in excess of 750 feet from the proposed hotel; and a rear yard adjustment.

Pursuant to CEQA, the City prepared an initial study of the hotel Project to evaluate its potential environmental impacts. The initial study determined that the Project would result in potentially significant effects relating to aesthetics, biological resources, noise and public services, but concluded that with mitigation measures, the potential impacts would be mitigated to less-than-significant levels.  For all remaining impact categories, including population and housing, and cumulative impacts, the initial study concluded the Project would cause either a less than significant impact or no impact.

With respect to population and housing, the initial study concluded that converting the building to a hotel would not displace housing units or residents because the apartment units

_Owners of San Francisco Institute v. City and County of San Francisco_ (2018) 22 Cal.App.5th 77, 85, fn. omitted.)  The statutory scheme provides real property owners "the absolute right to exit the residential rental business."  (_San Francisco Apartment Assn v. City and County of San Francisco_ (2016) 3 Cal.App.5th 463, 477.)

6

had been withdrawn from the rental market in May 2013 and the building was vacant. The initial study also found that the Project did not meet the minimum threshold of 25 multi-family units that had been adopted by the City as creating a potential impact.[5] Therefore, the initial study concluded that no additional analysis was required with respect to the Project's impact on population and housing.

Following a public hearing, on December 21, 2015, the Zoning Administrator adopted an MND (the 2015 MND) that had been issued by the City Planning Department. The Zoning Administrator also approved the requested CUP, a zone variance to permit off-site parking, and an adjustment to permit a 9-foot, 5-inch rear yard in lieu of 15 feet. Mitigation measures identified in the 2015 MND were adopted as conditions of approval.

Shain, who was a resident of another building in the area, appealed the Zoning Administrator's decision to the Commission. At a March 8, 2016 hearing, the five-member Commission, with two members absent, was deadlocked on a 2-1 vote, resulting in

---

[5] The City, in its CEQA Thresholds Guide, has adopted screening criteria to help it determine whether a proposed project would have a significant impact on population and housing displacement. The criteria ask "[w]ould the project result in a net loss of housing equal to or greater than a one-half block equivalent of habitable housing units through demolition, conversion, or other means? (One-half block is generally equivalent to 15 single-family or 25 multi-family dwelling units)" *or* "[w]ould the project result in the net loss of any existing housing units affordable to very low- or low-income households (as defined by federal and/or City standards), through demolition, conversion, or other means?"

7

the denial of the appeal and the affirmance of the Zoning Administrator's decision.

On April 11, 2016, Shain appealed to the City Council, challenging the adoption of the 2015 MND as well as the approval of the zone variance for off-site parking. Before the City Council's Planning and Land Use Management (PLUM) Committee conducted its hearing on the appeal, the owner withdrew the request for the zone variance for off-site parking. Therefore, the only matter that remained in the administrative appeal was Shain's challenge to the Zoning Administrator's adoption of the 2015 MND.

Following a hearing, the PLUM Committee recommended that the City Council deny the appeal and uphold the Zoning Administrator's adoption of the 2015 MND for the Project. The City Council adopted the PLUM Committee's report and approved the Project. On July 1, 2016, the City filed a notice of determination that the Project had been approved, with mitigation measures that were made a condition of the approval.

2. *Trial court proceedings.*

Shain, joined by Blonde, who had been a tenant in the building, and HERO, an unincorporated association formed after the City approved the 2015 MND for the Project, filed a petition for writ of mandate and complaint for declaratory and injunctive relief, challenging the City's approval of the Project. They alleged, inter alia, that the City had failed to prepare an EIR as required by CEQA and had failed to prepare a legally adequate initial study and MND, and that the Commission had violated the law by failing to act on Shain's appeal. The gravamen of the action was that the City was required to prepare an EIR to analyze the direct, indirect, and cumulative impact of this Project

8

and similar projects on the supply of rent-stabilized housing and the dislocation of tenants from such housing.

After hearing the matter, the trial court denied the petition for writ of mandate in its entirety and entered judgment in favor of the City and the owner. The trial court ruled, inter alia, that a proposed project's impacts are measured against a baseline, which normally consists of the physical environmental conditions in the vicinity of the project as they exist *at the time the environmental analysis is commenced.* Here, the environmental analysis for the boutique hotel Project commenced in 2015. By that time, the property was a vacant building that was no longer being rented. Thus, the City's 2015 MND properly concluded that the Project would have no impact on population and housing because it would not displace any tenants or eliminate any rental units; the residents had vacated the property long before the hotel was even considered or proposed. The trial court concluded: "HERO's entire CEQA claim therefore fails on this basis because HERO used the wrong baseline."

The trial court further ruled that leaving aside the issue of the baseline, HERO failed to show that the Project would have a significant impact on "the physical environment, not just socioeconomic impacts," stating that CEQA "does not require consideration of social effects that do not contribute to a secondary physical impact." The trial court also reasoned that setting aside entitlements for the Project would not result in the 18 units being returned to the rental market because the "City is bound by the Ellis Act and cannot compel the property owner to 'bring back' these units to their prior use and rent-stabilized status."

9

The trial court also ruled that the Commission properly acted on Shain's appeal, noting that two members of the Commission voted to deny the appeal while one voted in favor, and that three votes were required to overturn the Zoning Administrator's decision.

HERO filed a timely notice of appeal from the judgment.

**CONTENTIONS**

HERO contends: (1) substantial evidence in the record supports a fair argument that the cumulative environmental effects of the Project and similar related projects are significant and cause substantial adverse effects on human beings within the meaning of CEQA, requiring the City to prepare an EIR; (2) the City's initial study for the Project failed to inquire into the *cumulative* environmental effects of the Project and their substantial adverse human impact, and therefore the trial court should have ordered the City to void the Project approvals and to prepare a proper new initial study; (3) the City Council failed to proceed in the manner required by CEQA by determining Shain's administrative appeal without considering the Project-related permits, and the City's bifurcated review procedures violate CEQA; and (4) the Commission's failure to act on Shain's appeal violated state and local law.

**DISCUSSION**

1.  *The City was not required to prepare an EIR to address the Project's alleged impact on the loss of rent-stabilized housing units or the displacement of tenants because the property previously had been withdrawn from the rental market pursuant to the Ellis Act; under CEQA the assessment of impacts of a proposed project ordinarily is based on conditions as they exist at the time the environmental analysis is commenced.*

a.  *Standard of review.*

"In challenging the agency's decision to adopt a mitigated negative declaration, the party opposing the Project . . . bears the burden to present substantial evidence of a fair argument that the mitigation measures are inadequate to avoid the potentially significant effects. [Citations.] 'Substantial evidence includes facts, reasonable assumptions based on fact, and expert opinion supported by facts. [Citation.] Substantial evidence does not include speculation, unsubstantiated opinion, or evidence that is clearly erroneous. [Citation.]' [Citation.] If such evidence exists, the [court reviewing the agency's decision] must set aside the agency's decision to adopt a negative declaration or a mitigated negative declaration as an abuse of discretion in failing to proceed in a manner as required by law. [Citation.]" (*Citizens for Responsible & Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1332.)

In "reviewing the trial court's judgment on a petition for writ of mandate, we apply the same test. [Citations.] We independently review the administrative record to determine whether the agency failed to proceed in a manner consistent with the requirements of CEQA. [Citations.]" (*Citizens*, *supra*, 160 Cal.App.4th at p. 1332.)

11

b. *General principles.*

As discussed above, pursuant to CEQA, "a public agency[6] pursuing or approving a project need not prepare an EIR unless the project may result in a 'significant effect on the environment' (§§ 21100, subd. (a), 21151, subd. (a)), defined as a 'substantial, or potentially substantial, adverse change in the environment' (§ 21068). If the agency's initial study of a project produces substantial evidence supporting a fair argument the project may have significant adverse effects, the agency must (assuming the project is not exempt from CEQA) prepare an EIR. (Cal. Code Regs., tit. 14, § 15064, subd. (f)(1); *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75.) If the initial study instead indicates the project will have no significant environmental effects, the agency may . . . so state in a negative declaration. (Cal. Code Regs., tit. 14, § 15064, subd. (f)(3).) [¶] An agency that, relying on a standard inconsistent with CEQA and the CEQA Guidelines, prepares only a negative declaration has not proceeded in the manner required by law and has thus abused its discretion, calling for a judicial remedy. [Citations.]" (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319, fn. omitted (*Communities*).)

To decide "whether a given project's environmental effects are likely to be significant, the agency must use some measure of the environment's state absent the project, a measure sometimes referred to as the 'baseline' for environmental analysis. According to an administrative guideline for CEQA's application,

---

[6] Here, the City was the lead agency with principal responsibility for approving the project. (§ 21067.)

12

*the baseline 'normally' consists of 'the physical environmental conditions in the vicinity of the project, as they exist at the time . . . environmental analysis is commenced . . . .'* (Cal. Code Regs., tit. 14, § 15125, subd. (a).)" (*Communities, supra,* 48 Cal.4th at p. 315, italics added.)[7] [8]

The baseline determination is an important component of the CEQA process, as it sets the criterion by which the agency determines whether the proposed project has a substantial

---

[7]     California Code of Regulations, title 14, section 15125, subdivision (a), was amended to its present form in December 2018 (see History foll. Cal. Code Regs., tit. 14, § 15125), in respects not pertinent to this appeal.

[8]     Despite the general rule that the baseline normally consists of the physical environmental conditions at the time the environmental analysis is commenced (*Communities, supra,* 48 Cal.4th at p. 315), " 'the date for establishing baseline cannot be a rigid one.  Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods.' [Citation.]  In some circumstances, peak impacts or recurring periods of resource scarcity may be as important environmentally as average conditions.  Where environmental conditions are expected to change quickly during the period of environmental review for reasons other than the proposed project, project effects might reasonably be compared to predicted conditions at the expected date of approval, rather than to conditions at the time analysis is begun.  [Citation.]  A temporary lull or spike in operations that happens to occur at the time environmental review for a new project begins should not depress or elevate the baseline; overreliance on short-term activity averages might encourage companies to temporarily increase operations artificially, simply in order to establish a higher baseline." (*Id.* at pp. 327–328.)

adverse effect on the environment.  (*John R. Lawson Rock & Oil, Inc. v. State Air Resources Bd.* (2018) 20 Cal.App.5th 77, 103– 104.)  However, neither "CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline.  Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence.  [Citation.]" (*Communities*, *supra*, 48 Cal.4th at p. 328.)

   c.  *The City selected an appropriate baseline; it properly applied the general rule that the baseline consists of environmental conditions as they exist at the time environmental analysis is commenced.*

  HERO argues that the City was required to prepare an EIR for the Project because substantial evidence in the record supports a fair argument that the cumulative environmental effect of this Project and similar related projects will be the elimination of rent-stabilized housing units in Hollywood, and displacement of a substantial number of renters who rely on rent-stabilized housing.  The argument lacks merit because, as we discuss, the baseline against which the Project properly was measured was a vacant building, *not* a tenant-occupied rental property.[9]

---

[9] Because we reject HERO's challenge to the City's baseline determination, we need not consider whether the loss of housing or displacement of tenants could, under other circumstances not present here, result in a reasonably foreseeable indirect environmental impact cognizable under CEQA.

14

Here, at the time the environmental analysis for the Project was commenced in 2015, the existing condition of the property did not include rent-stabilized apartments, as the building had been withdrawn from the rental market as of May 2013 pursuant to the Ellis Act, and was uninhabited.  Thus, the City properly determined the baseline from which to measure the Project's impact on population and housing was a vacant building that was no longer part of the Hollywood rental market.

HERO contends the respondents' baseline theory relies on an "unproven hypothetical" that the owner's 2013 decision to opt out of renting the units was irreversible and would not have changed if, for example, the City were to deny the application to convert the property to a boutique hotel.  HERO argues that had the units again been offered for lease in 2015, they would have been subject to rent-stabilization requirements.  (Gov. Code, § 7060.2; LAMC, § 151.26.)  Therefore, according to HERO, notwithstanding the removal of the property from the rental market pursuant to the Ellis Act in 2013, it was error to exclude the 18 units from the 2015 baseline for purpose of CEQA review.

Contrary to HERO's argument, the "unproven hypothetical" is being posited by HERO, not by respondents.  HERO's theory that the owner may at some point restore the apartment units to the rental market is purely speculative.  Further, HERO's argument that the Ellis Act does not preempt municipal control over the demolition and redevelopment of residential property (Gov. Code, §§ 7060.7, subd. (b), 7060.1, subd. (b); *San Francisco Apartment Assn. v. City and County of San Francisco, supra*, 3 Cal.App.5th at p. 485) does not meet the

issue.[10]  The Ellis Act entitles real property owners to exit the residential rental business (3 Cal.App.5th at p. 477), which is what occurred here in 2013.  Thus, at the time the environmental analysis for the Project commenced in 2015, the subject real property consisted of a vacant building that had been withdrawn from the residential rental market two years earlier.  Because the Project would not displace any tenants or remove any rent-stabilized units from the market—those events already had occurred independently of this Project—the City properly determined that an EIR was not required to analyze the Project's impact on housing and population.

Given the historical circumstances of this fact situation, HERO's suggestion that the 2009 condominium project and the 2015 hotel Project should be analyzed as a whole is unpersuasive, and properly was rejected by the trial court.  *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376 reiterated "the principle that 'environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.' [Citation.]" (*Id*. at p. 396.)  However, that principle is not implicated here.  The record reflects that the subject property was removed from the rental market pursuant to the Ellis Act in 2013, to enable the building to be demolished

---

[10]     *Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, cited by HERO, has no bearing on the baseline determination.  It simply held that the landlord could not evict tenants pursuant to the Ellis Act without first complying with the mitigation conditions of the EIR.  (*Id*. at p. 454.)

and replaced with a condominium project. After that plan failed for lack of financing, the instant Project was proposed to repurpose the property as a boutique hotel. There is nothing to suggest that the instant Project was "a reasonably foreseeable consequence of the initial project" (*id*. at p. 396) or that the initial study and 2015 MND were an end run around CEQA.[11] (Compare, *Arviv Enterprises, Inc. v. South Valley Area Planning Com*. (2002) 101 Cal.App.4th 1333, 1336 [developer was required to obtain an EIR for a 21-house development for which he had obtained a series of discrete approvals over a short period of time].)

In sum, we agree with the trial court that HERO's CEQA claim fails because the relevant baseline in 2015 was a vacant building that already had been withdrawn from the residential rental market. Therefore, the record does not support a fair argument that the Project would have a substantial adverse impact on Hollywood's stock of rent-stabilized housing or on displacement of residents.

d. *No issue as to cumulative impacts*.

HERO further contends the City's initial study failed to inquire into the cumulative impact of the Project with respect to loss of housing and displacement of residents.

However, "[w]hen there is no substantial evidence of any individual potentially significant effect by a project under review, the lead agency may reasonably conclude the effects of the project will not be cumulatively considerable, and it need not require an

---

[11] Of course, were there evidence of an attempted end run around CEQA, use of a different baseline may well be appropriate. However, that issue is not before us, given the circumstances of this case.

17

EIR on this basis. [Citation.]" (*Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 701–702.) Because there is no substantial evidence that the Project may have an adverse impact on the supply of rent-stabilized housing units in the Hollywood area or on displacement of residents, the City was not required to inquire into the cumulative impact of the Project with respect to population and housing.

### e. *Other issues not reached.*

The baseline issue is dispositive. Having determined that an EIR was not required because there is no substantial evidence that the Project may result in the loss of affordable housing or the displacement of tenants, as the building already had been withdrawn from the rental market pursuant to the Ellis Act and was vacant, it is unnecessary to reach any related issues.[12]

The court is mindful of the shortage of affordable housing in the City of Los Angeles. The visibility of homelessness is a daily reminder of the unmet need for shelter, and high rents are a burden for many who have housing. This case, however, represents the confluence of two statutory schemes. Because the subject property had been withdrawn from the rental market pursuant to the Ellis Act and was vacant, there were no displacement of population or housing-related impacts to be addressed in an EIR pursuant to CEQA.

---

[12]     Thus, we need not address HERO's argument that the initial study failed to follow the screening criteria set forth in the City's CEQA Thresholds Guide (see fn. 5, *ante*), that the loss of affordable housing causes substantial adverse effects on human beings within the meaning of CEQA (Cal. Code Regs., tit. 14, § 15065, subd. (a)(4)) so as to require the preparation of an EIR, or any related issues raised by HERO and amici curiae.

18

2.  *HERO's procedural arguments.*

    a.  *No merit to HERO's contention that CEQA was violated because the City Council's review was limited to the Zoning Administrator's adoption of the 2015 MND.*

HERO contends that CEQA was violated because the City Council's review was limited to the Zoning Administrator's adoption of the 2015 MND, and the City Council did not exercise discretionary review over the other Project entitlements, namely, the CUP, the zone variance to permit off-site parking, and the Zoning Administrator's adjustment with respect to the depth of the rear yard.[13]  The argument is meritless.

CEQA "requires the person or persons responsible for approving a project (the 'decisionmaking body' in CEQA parlance) also be responsible for complying with CEQA's environmental review (e.g., by certifying an EIR, adopting a negative declaration or MND, or determining that the project is exempt).  [Citations.]" (*Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 187 (*Clews*); accord, *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 731 (*POET*); *Citizens for the Restoration of L Street v. City of Fresno* (2014) 229 Cal.App.4th 340, 360 (*Fresno*).)  As explained in *POET*, "[f]or an environmental review document to serve CEQA's basic purpose of informing governmental decision makers about environmental issues, that document must be reviewed and considered by the same person or group of persons who make the decision to

---

[13]  We note that before the City Council considered the appeal, the owner withdrew its request for a zone variance to permit off-site parking.  Therefore, HERO's argument with respect to administrative review of the zone variance became moot.

19

approve or disapprove the project at issue.  In other words, the separation of the approval function from the review and consideration of the environmental assessment is inconsistent with the purpose served by an environmental assessment as it insulates the person or group approving the project 'from public awareness and the possible reaction to the individual members' environmental and economic values.'  [Citation.]" (*POET*, *supra*, 218 Cal.App.4th at p. 731, fn. omitted.)

For example, in *Fresno*, a municipal historic preservation commission had the authority to approve a demolition permit, and thus the authority to approve the project, but it lacked the authority to also approve the MND for the project, resulting in an improper splitting of decisionmaking authority between the preservation commission and the city council.  (*Fresno*, *supra*, 229 Cal.App.4th at pp. 354–360.)

On the other hand, in *Clews*, the hearing officer was the municipality's decisionmaking body; the hearing officer had the authority to approve the project as well as to adopt the MND. (*Clews*, *supra*, 19 Cal.App.5th at pp. 187–188.)  That procedure satisfied CEQA's requirement that the decisionmaking body also be responsible for complying with CEQA's environmental review. (*Ibid*.)

In the instant case, as discussed above, the Zoning Administrator was the "decisionmaking body"—it was the Zoning Administrator who approved the CUP, approved the zone variance to permit off-site parking, approved the rear yard adjustment, and also adopted the 2015 MND.  There was no splitting of decisionmaking authority over the Project.  Thus, the Zoning Administrator's "adoption of the MND was procedurally

20

proper because he was the City's decisionmaking body for the project. [Citations.]" (*Clews*, *supra*, 19 Cal.App.5th at p. 188.)

Thereafter, the Zoning Administrator's decision adopting the 2015 MND was appealable to the Commission and then to the City Council, in compliance with CEQA. As stated in *Clews*, *supra*, 19 Cal.App.5th at page 187, "[i]f the decisionmaking body is unelected, . . . the decisionmaking body's compliance with CEQA must be appealable to the agency's elected decisionmaking body, if any. [Citations.]"[14]

HERO contends the City Council failed to proceed in accordance with CEQA because it solely considered the Zoning Administrator's adoption of the 2015 MND, without reviewing the other Project-related approvals. The argument is meritless because CEQA does not require that all project approvals be appealable to the City Council. "Neither CEQA nor the Guidelines require that a local agency's elected decisionmaking body accept appeals regarding every project approval, separate and apart from environmental review. They require only that the environmental determination be appealable. [Citations.]" (*Clews*, *supra*, 19 Cal.App.5th at p. 189.) Therefore, the City was only obligated under CEQA to provide for an appeal to the City Council of the Zoning Administrator's adoption of the 2015 MND;

---

[14]    Section 21151 states at subdivision (c): "If a nonelected decisionmaking body of a local lead agency certifies an environmental impact report, approves a negative declaration or mitigated negative declaration, or determines that a project is not subject to this division, that certification, approval, or determination may be appealed to the agency's elected decisionmaking body, if any."

21

the City was not required by CEQA to afford an appeal from the other Project-related approvals.

For these reasons, there is no merit to HERO's contention that the City Council's review of the 2015 MND, without review of the other Project-related approvals, violated CEQA.

b. *No merit to HERO's contention that the Commission violated state and local law by failing to act on Shain's appeal and by failing to make findings.*

As indicated, Shain appealed the Zoning Administrator's decision to the Commission. At the March 8, 2016 hearing, with only three of the five members of the Commission present, the Commission deadlocked on a 2-1 vote in favor of denying the appeal. The Commission's failure to reach a decision is deemed a denial of the appeal and thus an affirmance of the Zoning Administrator's decision. (LAMC, § 12.24.I.4.)

HERO contends this manner of proceeding violated Shain's right to have her appeal actually determined. (LAMC, § 12.24, subd. I.4 [the appellate body "shall act within 75 days"].) The argument fails because the Commission *did* act on Shain's appeal. The Commission simply was unable to reach a decision, resulting in the denial of Shain's appeal and the affirmance of the Zoning Administrator's decision.

HERO further argues that even assuming two members of the Commission had the power to deny Shain's appeal, they violated state law by failing to make any findings to support their decision. (Cal. Code Regs., tit. 14, § 15065; *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515–517.) The argument fails because the Commission was deadlocked and thus was unable to reach a decision. There was no decision by the Commission to uphold the Zoning

22

Administrator's decision, and therefore no findings to be made in that regard.

In sum, HERO's procedural arguments are meritless.

## DISPOSITION

The judgment denying the petition for writ of mandate is affirmed. Respondents shall recover their costs on appeal.


EDMON, P. J.


We concur:



LAVIN, J.



EGERTON, J.


23

Filed 7/22/19

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HOLLYWOODIANS ENCOURAGING RENTAL OPPORTUNITIES (HERO) et al., <br><br>     Plaintiffs and Appellants, <br>     v. <br><br> CITY OF LOS ANGELES et al., <br>     Defendants and Respondents; <br><br> MILLENNIUM SETTLEMENT CONSULTING / 1850 NORTH CHEROKEE, LLC et al., <br><br>     Real Parties in Interest and Respondents. | B285553 <br><br> (Los Angeles County Super. Ct. No. BS163828) <br><br> ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

THE COURT:

    The opinion in the above entitled matter filed on June 28, 2019, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be partially published in the Official Reports and it is so ordered as follows. The opinion is certified for publication with the exception of Section 2 of the Discussion.

_____

EDMON, P. J.　　　　LAVIN, J.　　　　EGERTON, J.

1